In re the MARRIAGE OF James McClain HOAK, Jr., and Willa Gray Hoak

Upon the Petition of James McClain Hoak, Jr., Appellee,

And Concerning Willa Gray Hoak, Appellant.

No. 83–1413.

Supreme Court of Iowa.

March 20, 1985.

Michael H. Figenshaw and Mark L. Tripp of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellant.

Ross H. Sidney and Brian L. Campbell of Grefe & Sidney, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McGIVERIN, LARSON, SCHULTZ and WOLLE, JJ.

SCHULTZ, Justice.

This appeal involves the economic terms of a marriage dissolution. An unusual issue evolves from the trial court's order that subjected the children's assets, accumulated from gifts under the Uniform Gifts to Minors Act, Iowa Code chapter 565A, to use for their support in lieu of parental support. The balance of issues concern the valuation of the parties' property, a proper distribution of the property, and the payment of appraisal and attorney fees. We review de novo.

James McClain Hoak, Jr. and Willa Gray Hoak were married on December 30, 1967. James was a junior in law school at Stanford University. His parents paid his tuition and part of the living expenses of the couple. Willa was employed as a teacher. The parties moved to Arlington, Virginia, following James' graduation from law school. Willa taught school, and James worked for the Federal Communications Commission for one year. When they returned to their hometown, Des Moines, James joined a Des Moines law firm for one year, and Willa became a full-time homemaker. The couple have two children, a daughter born in 1972 and a son born in 1974. Throughout the course of their marriage, the Hoaks received supplemental gifts from both sets of parents which were used to boost their standard of living.

In 1971 James became one of the founders of Heritage Communications, Inc., (Heritage). He has continuously served Heritage as president and as a member of the board of directors. The parties' major asset is stock in Heritage which has increased through purchases, gifts, stock splits and exercise of stock options. When James organized Heritage, he invested $125,000, which he had borrowed personally, without his wife's signature, but with his father's guarantee. The parties and the paternal grandparents have also purchased Heritage stock for the Hoak children, naming Willa custodian. At the time of the dissolution, James held 176,431 shares of stock in his own name. Willa held 19,305 shares, and the children held 31,532 shares. The children also hold 2312 shares of Heritage Series B convertible preferred stock. On the day of the trial, Heritage common stock traded at 12⅛ on the New York Stock Exchange.

When the Hoaks returned to Des Moines in 1970, they moved into Willa's parents' home. Her parents gave them the home and its contents, a gift worth approximately $20,000. This home was sold in 1974 for $55,000 which was used to purchase the family home at the time of the dissolution. This home was substantially improved and had a stipulated value of $280,000, subject to a mortgage in the amount of $37,567. Willa's parents also had given the parties and their two children a summer home in Idaho with the understanding that the parents retained the right to use the property in the summer. Willa's mother survives her husband and still uses the property. The trial court found the summer home to have a value of $250,000.

At the time of the marriage James had assets in excess of $60,000 due to gifts from his parents. Willa had a life insurance policy in the amount of $2,000 which was paid in full. James' salary at the FCC of approximately $18,000 regressed when he accepted a position in the law firm and regressed further when he became president of Heritage. His 1971 salary at Heritage was $12,000. It increased at a slow, steady pace until the salary and bonus in

1979 was $65,333 and in 1980 $62,395. The next three years he earned $129,829, $169,538, and $175,000. In addition, he receives approximately $9000 a year in director's fees from a bank and an insurance company and a small amount of investment income.

On January 10, 1983, James filed a petition seeking a dissolution of the marriage. The parties have not disputed the finding that there had been a breakdown of the marriage relationship, nor is there a dispute concerning custody of the children. The parties agreed to joint custody of the children. Willa assumed their physical care subject to visitation with James from Thursday evening until Sunday evening and at other designated times.

I. *Child support.* As shown by her proposed findings of fact, Willa urged that James pay child support in the amount of $1250 per month per child until each child attains the age of 18 years and has graduated from high school, or marries, or is otherwise considered emancipated. She proposed the court terminate the support at age 18 because the property held in the children's names could be used for their support beyond age 18. She further contended that James should maintain the current health insurance policy and obtain dental insurance and the cost of any major medical expense should be equally shared by both parents. She suggested that the payments be increased or decreased according to changes in the National Consumer Price Index.

James, on the other hand, presented evidence through an expert witness that the sale of the children's preferred Heritage stock when converted to cash, after the payment of taxes, would produce nearly $363,000; the income after reinvestment would be over $36,000 per year. The trial court adopted James' contention that the assets be placed in trust for the support and maintenance of the minor children and ordered no parental support, except that James must keep and maintain all existing policies of dental and health insurance covering the minor children. The children

were not represented at trial by either a lawyer or a guardian ad litem. On appeal Willa challenges this order, maintaining the trial court should have provided that James pay monthly child support rather than establishing a trust for the children's support from assets owned by the children.

Willa first urges that the court did not have jurisdiction over the assets of the parties' minor children. James asserts it is axiomatic that a court of general jurisdiction may assume jurisdiction over the assets of minor children when it is in their best interests and may provide for the maintenance of the children out of their property and its income, citing 22 Am. Jur.2d *Infants* §§ 22, 27 (1969), and *Rabuse v. Rabuse,* 304 Minn. 460, 231 N.W.2d 493 (1975).

■ We hold that the trial court in a dissolution proceeding may assume jurisdiction over the assets held by a custodian pursuant to the Uniform Gifts to Minors Act, chapter 565A, to protect the children's interest. *Rabuse,* 304 Minn. at 462–64, 231 N.W.2d at 494–95. This is not unlike the protective power exercised over parents and children to assure that a child receives proper care and treatment. See *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981). Iowa Code section 598.2 provides the district court with jurisdiction over the subject matter of a dissolution action, which includes: (1) the award of custody, Iowa Code section 598.41; (2) the responsibility for child support, Iowa Code section 598.21(4); and (3) provision for the appointment of counsel to represent the interest of the child, Iowa Code section 598.12. Inherent in this statutory scheme is the jurisdiction and authority of the court to protect the children's financial interests. While this remedy is additional to those contained in the Uniform Gift to Minors Act, we agree with the Minnesota court's conclusion that the "enforcement procedure prescribed in the uniform act is clearly not exclusive and is not limited to a proceeding under the act." *Rabuse,* 304 Minn. at 462, 231 N.W.2d at 494.

The trial court went beyond the protection of the children's assets, however, when it ordered the money placed in trust for the purpose of supporting the children. Clearly, subsection 565A.4(2) allows the expenditure of the custodial property the custodian "deems advisable for the support, maintenance, education and benefit of the minor in the manner, at the time or times, and to the extent that the custodian in his discretion deems suitable and proper, with or without court order, with or without regard to the duty of himself or of any other person to support the minor or his ability to do so...." Willa, as custodian for the children, does not wish to exercise her discretion to expend the funds for the children's support, nor does she believe that the court has authority to establish a support trust with these funds.

■ James has cited no authority which would give the court the power to create a trust in this situation. In *Neiderhiser v. Neiderhiser*, 254 Iowa 791, 119 N.W.2d 245 (1963), this court approved the trial court's action in a divorce case, placing funds in a trust for the purpose of paying certain expenses; we stated that the court "had a right to fix the disposition of same for the benefit of either or both parties or the children." *Id.* at 803, 119 N.W.2d at 252. Subsection 598.21(5) also provides authority for the court to set aside some of the parents' money in a separate fund for the support of the children. *Neiderhiser* and subsection 598.21(5) only provide authority for use of the divorcing parents' property to create a trust for the children. Because the children's property was gifted to them under the Iowa Uniform Gifts To Minors Act, the donor no longer has title to the property. Iowa Code § 565A.3 (1983). In addition, we are concerned that the trust of the children's assets was created without the participation of the children through an appointed lawyer or guardian at litem. We hold that the trial court erred in creating a trust.

That is not to say, however, that the district court was without authority concerning these funds. "The court, on the petition of a parent or guardian of the minor or of the minor, if he has attained the age of fourteen years, may order the custodian to pay over to the minor for expenditure by him or to expend so much of or all the custodial property as is necessary for the minor's support, maintenance or education." Iowa Code § 565A.4(3) (1983). We recognize that if this Code section has been relied upon, questions would be raised concerning whether this issue was before the court and whether due process required notice to the children or representation. Assuming that the matter was properly before the court, our de novo review would indicate that expenditure of the children's funds for their support was not justified under the facts.

■ Parents have a statutory and common law duty to contribute to the support of their children. *Brown v. Brown*, 269 N.W.2d 819, 822 (Iowa 1978); Iowa Code ch. 252A (1983). Willa asserts that the court improperly relieved James of his support obligation when it ordered that the income from the children's trust fund be used to support the children. James asserts this ruling is proper under Iowa Code subsection 598.21(4) which requires that a child's financial resources be considered when a court orders child support payments.

Subsection 598.21(4) states:

Upon every judgment of annulment, dissolution or separate maintenance, the court may order either parent or both parents to pay an amount reasonable and necessary for support of a child. Consideration shall be given to the child's need for close contact with both parents and recognition of joint parental responsibility for the welfare of a minor child. In any order requiring payments for the support of a minor child the court shall consider the following:

(a) *The financial resources of the child* (emphasis added).

(b) The financial resources of both parents.

(c) The standard of living the child would have enjoyed had there not been an

annulment, dissolution or separate maintenance.

(d) The desirability that the party awarded either sole custody or, in the case of joint custody, physical care remain in the home as a full-time parent.

(e) The cost of day care if the party awarded sole custody or, in the case of joint custody, physical care works outside the home, or the value of the child care services performed by the party if the party remains in the home.

(f) The physical and emotional health needs of the child.

(g) The child's educational needs.

(h) The tax consequences to each party.

(i) Other factors the court may determine to be relevant in an individual case.

James argues that "a parent should not be compelled to provide support when he has previously conveyed assets, the income from which is more than sufficient to afford the minor children a luxurious standard of living. Equity should not extract a double payment of child support from a generous parent." In addition, James argues:

In reviewing the creation of a support trust, the donor's wishes should also be considered. The Petitioner made substantial gifts to his children to ensure their support in the event of death, illness or other contingencies. The donor did not intend his children to become wealthy patricians upon reaching the age of majority.

Because the stock has only a "speculative future value," James asserts it should be converted to stable income-producing investments.

James also cites three cases from other jurisdictions in which children's trust funds were used for their support. In each case special circumstances justified the use of a previously established trust fund for support. *Nielsen v. Nielsen*, 93 Idaho 419, 462 P.2d 512 (1969) (grandparents established trust fund with knowledge of divorce proceedings, using the larger portion of son's inheritance so he would not have to pay

child support); *Doelp v. Doelp*, 219 Pa.Super. 420, 281 A.2d 721 (1971) (trust established for support and education, and father's income inadequate); *McElrath v. Citizens & Southern National Bank*, 229 Ga. 20, 189 S.E.2d 49 (1972) (Georgia statute authorizes use of support trust to discharge support obligation). Because these cases are all based on other factors not a part of the present case, they are not good precedent for using a trust fund to relieve James of his obligation to support his children or for ordering the custodian to use custodial property for support.

In determining appropriate child support in the context of a dissolution action, we apply the factors listed in subsection 598.-21(4) to determine whether the gifts to these children should be utilized for their support pursuant to subsection 565A.4(3). There are nine factors to be considered in ordering payments for the support of a minor child; the financial resources of the child is only one factor. Other factors include the financial resources of both parents and the standard of living the child would have enjoyed had there not been a dissolution. The children's assets were gifts received from their parents. Just as James and Willa continued to receive substantial gifts from their parents throughout their adult lives, the Hoaks and their parents have made substantial gifts to these children. Prior to the dissolution, the gifted stock was not being used to support the children; in fact, this gift had only "speculative future value" and was non-income producing. Prior to the dissolution, James was supporting his children and, in addition, made generous gifts to them. Now, he wants those gifts to be used to provide the children's everyday expenses. The very nature of these gifts of stock belies any claim that they were meant to be used for the children's day-to-day support.

Ordinarily, a parent who has sufficient means will not be entitled to compensation for a child's support from the child's estate. *In re Guardianship of Nolan*, 216 Iowa 903, 904, 249 N.W. 648, 649 (1933). The children's resources should be

considered. However, when the parents have significant assets and income to support their children, gifts to minors should not be used to provide day-to-day support in the absence of contrary intent by the donor or other factors indicating that use for support is proper. The children's financial position should not be altered simply because their parents have dissolved their marriage. If the dissolution had not occurred, the children would have continued to be supported by their parents, and the gifted assets would not have been used for their support. The parents have an obligation to support their children which is not mitigated by gifts to the children prior to the divorce. This case does not involve the wisdom of the exercise of the custodian's discretion to use the funds for support; rather, it presents the question of whether her exercise of discretion to not spend the funds should be overturned. We hold that her refusal should not be overruled.

■ We now address Willa's claim that James should be required to pay child support in the amount of $1250 per month for each child. In our de novo review we have considered the joint parental duty to support the children and the factors stated in subsection 598.21(4), including other relevant factors in this case. We have discussed previously the factors concerning the financial resources of the children. We have taken as true Willa's testimony that as custodian, she does not intend to invade the custodial funds; however, we consider that it would not be inappropriate if she would use the income from the present accounts which provide interest or dividends, including the Heritage preferred stock, for the support of the children. We have considered the financial resources of both parents including their income and potential income from investments. James presented evidence that after the payment of taxes, indebtedness and interest, and living expenses his annual net cash flow would be $16,560. This does not include the ordered alimony of $1300 every two weeks or annual total of $33,800 which is subject to the condition on remarriage and which, of course, would be reduced by tax

savings. We have also considered that Willa may convert some of her Heritage stock to cash; however, she will have to pay taxes on the same and will have other cash outlay as a result of this litigation and because of her living expenses. We have also considered the other assets of the parties, and the property settlement set out in this opinion. Upon consideration of all these factors, we find that the trial court should have required James to pay support for each child in the amount of $500 per month for each child, commencing on October 1, 1983, and continuing on the first of each month thereafter until terminated. The support payments shall terminate on the first month after the child reaches 18 years of age, unless the child has not graduated from high school and is a full-time student. In any event child support payments shall terminate after the child has reached the age of 19. These payments shall also terminate on any month following the death of the child, the child's marriage, or the date the child is otherwise considered emancipated. No support is provided beyond this time since the custodial property previously referred to can be used for their support beyond this period.

In summary, the decree is modified by eliminating that portion which establishes a trust to preserve the children's assets and directs the income be used for support. The provisions concerning the petitioner's right to claim the children as dependents for tax purposes and the petitioner's duty to keep and maintain existing policies of dental and health insurance covering the minor children shall remain in the decree. The decree shall be further modified by providing child support as set out previously in this opinion.

II. *Property division.* Willa urges the trial court erred in the division of the property. In Willa's court-ordered proposed decree with findings of fact, she suggested the court divide the property by ordering James to transfer 27,786 shares of Heritage common stock that was titled in his name to her. The trial court followed James' proposal which left the stock as it

was titled. Willa does not challenge the division of the property made by the trial court, except she maintains that to make an equitable distribution of property James should be required to make the transfer that she had earlier suggested. We shall first address the valuation of certain assets which formed the primary basis for Willa's claim of inequitable division of property.

A. *Valuation.* Willa maintains that the court erred by undervaluing certain property awarded to James, e.g., Heritage common stock, a stock purchase plan and stock options. Also, Willa asserts that the court erred by overvaluing the personal property and Idaho lake real estate that was awarded to her in the decree.

At the time of the dissolution, James had title to 176,485 shares of Heritage common stock which included 98,829 shares received as gifts from James' parents. Within the decree the gifted shares were set aside to James as property not subject to distribution pursuant to Iowa Code section 598.-21(2). The remaining 77,657 shares were purchased by James and were distributed to him in the decree.

Willa owned 19,305 shares of Heritage common stock. James' parents gifted 2145 shares to Willa, and 17,160 shares were purchased during the marriage and titled in Willa's name. The court was consistent and treated Willa's shares like James' by setting aside to her the gifted shares not subject to the division of property and granting the remaining shares titled in her name to her as a portion of the division of assets.

The source of Willa's complaint is the action of the trial court in adopting the valuation of the stock by James' expert which discounted James' stock 40 percent from the price listed on the New York stock exchange, but only discounted Willa's stock 5 percent. Willa's expert used the reported trade-in price to value the stock.

In our review we agree with the trial court's ultimate assessment that James' expert was more plausible and credible on the valuation of Heritage common

stock. His expert spelled out the legal and practical restrictions on the marketability of James' stock due to his position with the company. The legal restrictions largely derived from the requirements of federal rules concerning the sale of stock by a "control person." There are restrictions on the amount of stock which can be marketed at a particular time, forms that need to be filed before and after the sale, and limitations on positioning the stock with a broker in a broker transaction. Practical considerations concerning the sale of stock by a president of the corporation, the relatively low volume of stock that is traded compared to other companies, and the legal restrictions on sales justify a discount of the stock.

Heritage is a publicly owned corporation with approximately 7,300,000 shares of outstanding stock owned by over 6000 shareholders. James' position as a "control person" is derived from his being an officer in the corporation rather than his having control of the company on the basis of his holdings.

We have no quarrel with the general rule that stock should be valued at market value if it can be ascertained. *In re Marriage of Moffatt,* 279 N.W.2d 15, 19 (Iowa 1979). Thus, we agree with the valuation of Willa's stock at the stock exchange rate less the estimated costs of a sale. We are satisfied that James has shown an exception to the general rule based on his position with the company and the marketability problems which also affect price. Just as we would have no problem evaluating James' stock above the market price if he had sufficient shares to control the affairs of the company—resulting in a premium being paid for his stock, we have no problem with discounting the stock when there are legal and practical restrictions on its marketability.

Our own review of the evidence leads us to a different conclusion than the trial court. We recognize that the findings of the trial court on the credibility of witnesses are given considerable weight in an equity case and that when the trial court's

valuation is well within the permissible range of evidence we generally are not inclined to disturb it. *In re Marriage of Bare*, 203 N.W.2d 551, 554 (Iowa 1973). In this case the trial court totally accepted the valuation by James' expert. We cannot agree. Although we do agree that this expert was much more credible, our review of the evidence indicates he went beyond the bounds of common sense. The expert made evaluations based on methods approved by the Internal Revenue Service for similar corporations; we are not convinced that this valuation is appropriate for this adversary proceeding. *Moffatt*, 279 N.W.2d at 19. Without extending this opinion, we believe that the stock could have been liquidated in a manner that would not require such an extensive discount. While the trial court cannot rely upon its own knowledge or speculate concerning the value of the stock, *Locke v. Locke*, 246 N.W.2d 246, 253 (Iowa 1976), the court may look at the broad range of the evidence affecting value and may arrive at something other than an exact value in making an equitable property award and allowance. *Moffatt*, 279 N.W.2d at 19. In valuing the property, we believe that a more equitable discount would have been in the broad range of 20 to 30 percent, rather than 40 percent, of the market price.

Willa also complains about the value placed on James' Heritage stock purchase plan, an employment qualified retirement plan. Prior to trial James stipulated the value to be $83,584, but at trial the value was reduced to $47,268 because of a change in the markets and the failure of the earlier estimates to consider tax consequences and the discount we have just discussed. In the division of property the tax consequences to a party may be taken into account. Iowa Code § 598.21(1) (1983). Subsection 598.21(1)(j) follows the general rule. 24 Am.Jur.2d *Divorce and Separation* § 926 (1983). We have previously indicated our disagreement with the trial court's reliance upon the 40 percent discount of the stock which also was used in this valuation.

James acquired stock options in Heritage common stock down through the years. These options give him the opportunity to purchase certain shares at a certain price during certain periods of time. Willa's expert placed a value of over $354,000 on these options. James testified that if he exercised the options he would have to pay ordinary tax on any increase and he would be limited on selling them. Thus, an outlay of cash would be required, and he would be hampered in recovering his purchase price. He also testified that the options may be cancelled or modified by the Board of Directors at any time without his consent and that he might not exercise the options. The trial court ascribed no value to the options despite the fact that James' expert admitted on cross-examination that they had a total value of $186,430. We find the trial court's action in ascribing no value to these options to be inconsistent with the weight of the evidence. We will treat the options as having a value of $186,430.

Willa's complaint concerning the overvaluing of property awarded to her by the trial court has merit. Willa and James each owned an undivided one-fourth interest in an Idaho vacation home that was gifted to them by her parents. The court counted her one-fourth interest as gifted property not subject to division and awarded her his one-fourth interest. The parties had stipulated prior to trial that the total value of the property was $200,000. At the time of trial James rejected this stipulation. Based upon a telephone conversation with a real estate agent, he valued the property at $300,000. The court set a value on the total property of $250,000 which renders the one-fourth interest to be $62,500, $12,500 more than the stipulated value. Following review we value the property as stipulated.

Willa also complains about the valuation that the court placed on the personal property awarded to her. This personal property consists primarily of household goods, furs and jewelry. Her complaint specifically involves silverware, miscellaneous items and art objects, such as paint-

ings. Without repeating the testimony, much of the determination by the trial court depended on its assessment of the credibility of the witness employed by Willa and comparison of his testimony with insurance appraisals and the personal opinions of the petitioner. The trial court was in a better position to pass on the credibility of the witnesses. We will accept the valuations included in its findings of fact.

B. *Equitable division.* Willa maintains that, given the actual fair market value of the parties' assets, the court's division of the marital property was inequitable. Although we do not agree with her assertion that James' stock should be transferred to her, we hold that the division was inequitable and must be adjusted by a cash payment from James to Willa.

The legislature has provided that in every dissolution action, the court shall divide the property of the parties "except inherited property or gifts received by one party, equitably between the parties," in consideration of 13 factors listed in subsection 598.21(1).[1] There need be neither an equal division nor a percentage division of the property; "that which is determinative is that which would constitute an equitable and just award under the circumstances." *Locke*, 246 N.W.2d at 251.

Willa maintains that she should have been awarded 27,786 shares of Heritage stock from the 337,657 shares titled in James that were not a result of gifts from his father. The value of this stock on the date of trial even with a 5 percent discount would be approximately $320,000. This disposition by the court would have caused substantial tax consequences to James, lowering the net accumulations of the parties; thus, it also would have affected Willa. Putting tax consequences aside, James, with the help of his father, formed the corporation and provided the impetus that resulted in this stock's net worth, while it is clear that Willa's interest in the company stock has been purely financial. We agree with the trial court's refusal to honor Willa's request.

Applying the factors enumerated in subsection 598.21(1), we uphold all of the terms of the trial court's decree which affect the division of property except, in order to reach an equitable result, we hold that a cash payment must be made by James to Willa. The trial court undervalued the assets awarded to James and overvalued the assets awarded to Willa. The trial court found that James, age 39, and Willa, age 38, did not suffer from significant physical or mental health problems and reviewed their educational backgrounds and style of living. The trial court correctly recognized the contribution of James toward the financial success of the

---

1. Subsection 598.21(1) provides for the consideration of the following factors in dividing the property:

a. The length of the marriage.

b. The property brought to the marriage by each party.

c. The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

d. The age and physical and emotional health of the parties.

e. The contribution by one party to the education, training or increased earning power of the other.

f. The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.

g. The desirability of awarding the family home or the right to live in the family home for a reasonable period to the party having custody of the children, or if the parties have joint legal custody, to the party having physical care of the children.

h. The amount and duration of an order granting support payments to either party pursuant to subsection 2 and whether the property division should be in lieu of such payments.

i. Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.

j. The tax consequences to each party.

k. Any written agreement made by the parties concerning property distribution.

l. The provisions of an antenuptial agreement.

m. Other factors the court may determine to be relevant in an individual case.

parties. Based on the court's valuation of the Heritage stock, the gifts set aside to James totaled $745,041 and those set aside to Willa totaled $111,030. In an appendix to the findings of facts and conclusions of law, the division of assets and indebtedness provided James with net property of $508,291 and Willa with net property of $563,904. We find that James' assets were undervalued in an amount in excess of $300,000, and Willa's assets were overvalued by $12,500. These valuations have not been reduced by any income tax that would accrue upon sale or transfer. Additionally, there were other liabilities and contingent indebtedness of the parties. We hold the trial court should have provided that James pay Willa the sum of $125,000; $25,000 should have been payable on October 1, 1983, and the balance should have been payable in ten annual installments commencing October 1, 1984. James shall have the option to pay additional sums and receive credit for them at any time. Interest would commence on the remaining balance due on October 1, 1983, at the rate of 10 percent, payable with the annual installment.

■ C. *Fees and costs.* Willa asserts that the trial court should have required James to pay the costs of her appraiser and more of her attorney fees. She also requests that we set attorney fees on this appeal. Our own review causes us to affirm the holding of the trial court in regard to appraiser fees and the amount of attorney fees awarded by the trial court. Our modification of the property division equips Willa to pay her own attorney fees on appeal.

All court costs at trial and on appeal are assessed to James.

The district court is directed to enter a supplement to the decree in accordance with this opinion.

DECREE OF DISTRICT COURT MODIFIED AND AFFIRMED.

REMANDED.