APPEL, Justice
(dissenting).
I respectfully dissent. The result embraced by the majority forces Stephen to face Hobson’s choices that will produce an inequitable result in this case.
The end result of the majority in this case is that Rachel, who entered the twelve-year marriage with assets of $34,808, will leave the marriage with a significant increase in her earning capacity because of education and training she obtained during the course of the marriage and an unencumbered award of $1,087,716. Stephen, on the other hand, will be left with a substantially impaired earning ability and assets carrying a substantial tax liability. This inequity is demonstrated by an exploration of the available options to Stephen to meet the $1,087,716 equalization payment imposed by the majority’s property division.
First, Stephen can simply sell the family farm, pay Rachel $1,087,716, and keep the balance for himself. There are two problems with this option. First, if he chooses this option, all the taxes and transaction costs will be borne by Stephen. It was undisputed at trial that the tax and transaction costs associated with sale of the farmland would approach thirty percent of its property value. Clearly, it would be inequitable for Stephen to bear the entire amount of the transactions costs to meet the obligation of the divorce decree. See Iowa Code § 598.21(5)(i)-(/) (2009) (specifically directing the court to take into account the “economic circumstances” and “[t]he tax consequences to each party”); see also In re Marriage of Hook, 364 N.W.2d 185, 194 (Iowa 1985) (considering the tax burden to one party in dividing stock during divorce proceeding); In re Marriage of Pittman, 346 N.W.2d 33, 36 (Iowa 1984) (affirming district court’s equitable division of marital assets where the court properly “considered that if [the divorced wife] sold the house a 7 percent realtor’s fee must be deducted from the net equity”); In re Marriage of Hogeland, 448 N.W.2d 678, 680-81 (Iowa Ct.App.1989) (“[W]here ... the payment of a lump sum of cash to a spouse will in all probability require the liquidation of capital assets, the income tax consequences of such a sale *688 should be considered by the trial court ....”); cf. In re Marriage of Hardy, 539 N.W.2d 729, 732 (Iowa Ct.App.1995) (reducing district court’s alimony award where the evidence demonstrated divorced husband’s income was insufficient to make payment, additional borrowing was not possible, and liquidation of farm assets would “decrease his income and result in considerable income tax consequences”).
Second, instead of complete liquidation, Stephen could sell a large enough portion of the family farm to meet the obligation imposed by the majority. If he chooses this option, he will still be forced to bear tax and transaction costs, although the inequity would be less than that which would result from complete liquidation of the farm. In addition, however, liquidation of substantial farmland cannot help but impact the economic viability of the family farm. By reducing economies of scale as well as the land in production, the sale of substantial farm assets will significantly impair Stephen’s ability to earn a living.
The trial court found that the farm operation during the course of the marriage netted Stephen and Rachel approximately $55,000 per year. If Stephen is required to sell substantial farm assets, it is a virtual certainty that Stephen’s income from operating the family farm, assuming it remained economically viable after the sale of major assets, would significantly decline. This result flies in the face of our caselaw, which indicates that maintaining the life style of the participants of a marriage, to the extent possible, is a goal of property distribution. See In re Marriage of Goodwin, 606 N.W.2d 315, 319-20 (Iowa 2000) (explaining that gifted and inherited property should be divided when necessary to allow each party to maintain an increased standard of living that occurred during the marriage); In re Marriage of Muelhaupt, 439 N.W.2d 656, 659 (Iowa 1989) (same); In re Marriage of Steenhoek, 305 N.W.2d 448, 454 (Iowa 1981) (listing maintenance of standard of living as one of the relevant considerations in the property distribution determination); see also Iowa Code § 598.21(5)(f) (directing the court to consider the ability of each party to “become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage”).
This significant decline in Stephen’s income if he sells substantial farm assets will occur at a time when the income of Rachel, his spouse, will dramatically increase. During the marriage, Stephen supported Rachel’s effort to obtain additional education in order to obtain licensure as a physical therapist. She now earns $65,520 per year. Stephen’s yearly income of $55,000 from farm operations will in all likelihood significantly decline due to the steps he is forced to take to meet the equalization payment in this case.
A third option for Stephen is to mortgage the family farm and attempt to continue farming operations. Assuming Stephen obtains a $1,087,716 loan, he will have substantial yearly service obligations. The service obligations will lead to a decrease in farm income for Stephen. Thus, as with the land sale approach, Stephen’s ability to earn income from the family farm operation will decline as a result of the divorce, while Rachel’s ability to earn income will materially increase.
A fourth option might be to mortgage the farmland and rent it out to a third party. Under this option, the rental income might be sufficient to service the loan required to meet the $1,087,716 obligation from the district court’s divorce decree. Under this scenario, of course, Stephen would no longer be farming the land and would need to earn income in an off-the-farm job. He has only a high school education and is unskilled, however, and *689 there is no substantial likelihood that Stephen could earn $55,000 in an off-the-farm job.
In effect, what the majority has done is force Stephen to sell the family farm in its entirety and assume an inequitable share of transaction costs or, in the alternative, pursue options other than sale of assets which will almost certainly decrease his ability to maintain his standard of living while the lifestyle of his former spouse increases. Both results are contrary to our caselaw. The harsh Hobson’s choice faced by Stephen requires some adjustment to the trial court’s award.
Further, the majority places no value in preservation of the family farm as an ongoing enterprise. Our caselaw is to the contrary. In In re Marriage of Callenius, 309 N.W.2d 510, 515 (Iowa 1981), we upheld an award that did not reach equality where farmland was the principle asset of the parties, where one spouse’s vocation was farming, and where that spouse brought considerable farm assets into the marriage. We endorsed the reasonableness of court orders “awarding a farm to the spouse who operated it and in fixing the awards and schedule of payments to the other spouse without reaching equality so the farmer-spouse might retain ownership of the farm.” Callenius, 309 N.W.2d at 515. Under the teaching of Callenius, the maintenance of the family farm as a viable entity is a factor to consider in making an equitable award, even if the result is that the division of assets is not equal.
I disagree, however, with certain assertions made by Stephen. In particular, like the majority, I disagree with Stephen’s assertion that because Rachel did not participate directly in farming operations, she should not be considered an equal participant in the marriage. She was primarily responsible for raising six children, and no one disputes that she worked hard as part of the family unit even though she did not generate outside income. The suggestion that Rachel was not an equal partner in the marriage based upon the allocation of family responsibilities cuts nothing but air. See In re Marriage of Briggs, 225 N.W.2d 911, 913 (Iowa 1975) (“Husband and wife need not, during happy days, keep a ledger to prove his or her economic value should the marriage later founder.”). While I reject this overreach, Stephen should not be penalized in the property distribution because he made a completely unpersuasive argument.
It seems to me at the end of the day, there are several propositions that the majority does not dispute.
1. Rachel’s postdivorce earning ability, based in part upon education obtained during the marriage, is $65,520 per annum as a physical therapist.
2. Stephen’s earning ability arising from his farming operations of $55,000 per year during the marriage cannot help but be adversely affected by the steps he is forced to take as a result of the equalization payment required by the court.
3. Rachel will have an unencumbered asset of $1,087,716, while the farm land retained by Stephen is subject to a major tax encumbrance.
4. Rachel’s future economic prospects are improved by the dissolution, while Stephen’s future economic prospects are impaired. The majority finds these results equitable. I do not.
In the end, establishing an appropriate property division in this case is a matter of art rather than science. While I reject the award of $1,087,716 by the majority as inconsistent with the thrust of our caselaw and too onerous on Stephen, I also reject the relatively low award of $250,000 by the court of appeals. In my view, based on *690 the totality of equities, I would award Rachel $600,000 to be paid by Stephen over a ten-year period in equal installments. This result will avoid the potential tax inequities and will give Stephen a better chance of continuing as an independent farm operator, while at the same time providing Rachel with a substantial share of marital assets. As it stands now, Rachel will have the financial ability to have a much improved standard of living as a result of the dissolution, while Stephen’s ability to generate income will be substantially reduced.
HECHT, J., joins this dissent.