# IN THE COURT OF APPEALS OF IOWA

No. 14-0568
Filed February 11, 2015

IN RE THE MARRIAGE OF CURTIS D. MARTIN
AND DAWN DAVIS-MARTIN

Upon the Petition of
CURTIS D. MARTIN,
      Petitioner-Appellee/Cross-Appellant,

And Concerning
DAWN DAVIS-MARTIN,
n/k/a DAWN DAVIS,
      Respondent-Appellant/Cross-Appellee.
_____

      Appeal from the Iowa District Court for Jones County, Marsha M. Beckelman, Judge.

      A wife challenges financial aspects of the dissolution decree; her former husband cross-appeals the award of spousal support and a mortgage issue. **AFFIRMED AS MODIFIED AND REMANDED.**

      Stephen B. Jackson Sr. and Amy L. Reasner of Lynch Dallas, P.C., Cedar Rapids, for appellant.

      Janette S. Voss of Remley, Willems, McQuillen & Voss, L.L.P., Anamosa, for appellee.

      Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, J.**

Dawn Davis-Martin challenges several financial aspects of the decree dissolving her marriage to Curtis Martin. Her most compelling claim, and the ground upon which we modify the decree, is the valuation of the closely held business owned by her ex-husband's family. Because we find Dawn's accounting expert provided a more recent and more accurate report of the company's fair market value, we modify the decree to adopt that valuation and to award Dawn a greater equalization payment.

Beyond the property settlement, Dawn contends the district court erred in awarding rehabilitative alimony of $2000 per month for ten years rather than traditional alimony. Curtis cross-appeals on this issue, contending the duration of the alimony payments should be cut to five years. Curtis also seeks a credit for his post-decree payments which reduced the mortgage principal owed on the marital residence, where Dawn continued to live.

Because spousal support in the amount $2000 per month for ten years is equitable in light of the modified equalization payment, we affirm that aspect of the decree. We do not believe equity requires us to credit Curtis for his post-decree mortgage payments. We also decline to award Dawn fees for her expert witness or for her trial and appellate attorneys, though we do order Curtis to pay the costs of the transcript for appeal.

Further, both parties assert they were prejudiced by the delay of twenty-two months between the dissolution trial and the district court's issuance of the decree. Because it is not clear either party is entitled to net relief based on the

time lag, and no precedent suggests what remedy would be available, we decline to modify the decree on that basis. Finally, because both parties agree the district court should address the issue of post-secondary education subsidies, we remand for that purpose.

## I. Background Facts and Proceedings

The main dispute between the parties is the value of Curtis's interest in Bennett Machine and Fabricating, Inc., the closely held corporation run by his family. Curtis and his two siblings each own about one-third of the company. His parents, Linda and Dean Martin, started the business in 1973 as a farm repair shop in Bennett, Iowa. The business eventually outgrew its building in Bennett, and moved to a new, expanded facility in Anamosa in 1995. At the time of the dissolution trial, the business employed 114 workers and supplied parts to John Deere.

Curtis started working for Bennett Machine as a teenager—first sweeping floors and then running a machine. Except for three years he spent in the Army after high school, Curtis has worked for the family business his entire adult life. At the time of the trial, his title was vice president for operations. His wages for 2010 were $294,854, including a $197,024 bonus. His wages for 2011 were $324,142, including a $235,000 bonus. He expected to continue working for the company after the dissolution.

Curtis and Dawn married in 1993. Just before getting married, Dawn earned her bachelor's degree from Iowa State University in visual studies; her goal was to work in art buying or curation. At the time of the marriage, she

worked for Ben Franklin Crafts as a department manager. When their sons were born in 1996 and 2001,[1] Curtis and Dawn agreed Dawn would stay home and care for them until they started school. This arrangement took Dawn out of the competitive work force for more than ten years.

Dawn started working for Bennett Machine in 2008, filling clerical roles, and stayed for a little more than three years, until she was fired in March 2011. Her firing occurred seven months after she and Curtis separated. Her supervisor told her she "no longer fit with the company." At the time she left the company she was a purchasing assistant, earning approximately $36,000 per year. Since her termination, she has received unemployment benefits of $404 per week before taxes, which were set to expire shortly after the trial. Dawn testified she had trouble finding a new job, in part, because she has not been able to give prospective employers a good reference from Bennett Machine. Dawn was considering returning to college to earn her teaching certificate.

Curtis filed a petition to dissolve the marriage on August 18, 2010. A temporary order required him to pay the mortgage on the marital residence in Monticello where Dawn continued to live. The court also ordered Curtis to pay Dawn $400 per month in temporary spousal support after she lost her job with his family company.

The district court held a dissolution trial from April 24–26, 2012. Both parties were forty-one years old at the time of the trial. Curtis testified that he had no health problems. Dawn testified she suffered from depression, and her

---

[1] The custody of the children was decided in the decree but is not an issue on appeal.

health care provider prescribed two medications, costing fifty-eight dollars per month, to treat the illness.

The court issued the decree dissolving the marriage on March 3, 2014. At the time the decree was issued, the couple had been married for twenty years. The court awarded Curtis "all right, title, and interest in Bennett Machine & Fabricating, Inc." In doing so, the court accepted evidence offered by Curtis as to the value of his interest in the business over a competing business valuation presented by Dawn's expert witness. The court ordered Curtis to make a cash payment to Dawn in the amount of $243,559.

In other pertinent parts, the decree required Curtis to pay $2000 per month in rehabilitative alimony for ten years.[2] The court ordered the parties to sell the marital residence in Monticello and split the net sale proceeds evenly. Finally, the court declined Dawn's request for Curtis to pay her remaining expert witness and attorney fees.

Dawn appeals and Curtis cross-appeals.

## II.    Standards of Review

We perform a de novo review of dissolution decrees, examining the entire record anew. *In re Marriage of Dean*, 642 N.W.2d 321, 323 (Iowa Ct. App. 2002). While we give weight to the district court's findings, particularly concerning witness credibility, we are not bound by them. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 484 (Iowa 2012).

---

[2] The decree also required Curtis to pay $1763.04 per month in child support; the parties do not challenge the child support requirement on appeal.

Because determining the value of a closely held corporation is an inherently difficult endeavor, we allow the district court considerable discretion in assigning a market value for the stock. *In re Marriage of Steele*, 502 N.W.2d 18, 21 (Iowa Ct. App. 1993). We are not inclined to disturb valuations when they fall within the permissible range of credible evidence. *In re Bare's Marriage*, 203 N.W.2d 551, 554 (Iowa 1973). But we do consider the purpose for which the valuation was completed and the methods that were used. *See In re Marriage of Hoak*, 364 N.W.2d 185, 192–93 (Iowa 1985) (reaching different conclusion on valuation than district court because expert used method not appropriate for adversary proceeding); *In re Marriage of Moffatt*, 279 N.W2d 15, 18 (Iowa 1979) (noting court was not limited to option price fixed by the shareholders in determining the value of stock for a dissolution action).

We also accord the trial court considerable latitude in determining the proper amount and duration of spousal support and will disturb the ruling "only when there has been a failure to do equity." *In re Marriage of Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *3 (Iowa 2015); *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996). We consider the property division and spousal support together in evaluating their individual sufficiency. *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998).

## III. Analysis of Decree's Financial Provisions

Iowa courts equitably divide all property owned by the parties at the time of divorce except inherited property and gifts received by one spouse. *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007); *see* Iowa Code

§ 598.21(5) (2009). Courts determine what is fair and equitable based on the particular circumstances of the parties. *Keener*, 728 N.W.2d at 193. Although an equal division is not required, courts recognize equality is often most equitable. *Id.*

### A. Valuation of Closely Held Corporation

Before dividing marital property, the dissolution court must identify all assets held in the name of either or both parties. *Id.* The assets must be assigned their value as of the trial date. *Id.* "The purpose of determining the value is to assist the court in making equitable property awards and allowances." *Moffatt*, 279 N.W.2d at 19.

In this case, the district court recognized "a large area of dispute" between the parties was the value of Curtis's interest in his family business, Bennett Machine and Fabricating, Inc. The general rule in dissolution cases is that stock should be valued at market value if it can reasonably be ascertained. *Moffatt,* 279 N.W.2d at 19. But it is difficult to ascertain market value for stock in a closely held corporation. *Id.* Thus, the intrinsic value of such a business may be determined by using a broad range of evidence, including the corporation's assets and liabilities, dividends paid, the character and permanency of the business, the control of the stock, the management structure, the market for articles produced, and other facts. *Id.*

Curtis first gained an ownership interest in the company in December 1998, when his parents, Linda and Dean Martin, gave him 244 nonvoting shares

and two voting shares of stock. In December 2009, the parents gave Curtis another 188 shares of nonvoting stock.

In January 2010, the parents decided to retire and offered to sell the company to Curtis and his two siblings. The purchase price was $3,000,000. Linda Martin testified she and her husband "would have liked more out of it, but we felt beings it was being sold to our children that it was acceptable to us."[3] As a result of the buyout of their parents, at the time of the dissolution trial, Curtis and his two siblings each owned roughly one-third of the company and the parents retained a lien on all shares of stock. Curtis and his siblings entered a buy-sell agreement on March 15, 2010, which controlled the transfer of their stock in the family business. The agreement outlined the price if the company shares were to be sold to another sibling or to the corporation; if the parties could not agree on a fair market value, the stock was to be valued according to the written opinion of business valuator John Maher of Holland, Michigan.

Maher completed appraisals of Bennett Machine in December 2009 and March 2010.[4] To determine the fair market value of the company as an ongoing concern, Maher used a discounted cash flow approach. That approach arrived at a value of $5,450,000. Maher then "applied a 24.2% discount for lack of marketability in determining the value of common shares," resulting in a

---

[33] Dawn testified she heard her mother-in-law Linda discuss receiving an earlier business valuation that was "too high, so she was having it sent back to be redone because the kids could not get a loan for the amount the business evaluator had come up with the first time around."

[4] The March 2010 economic analysis by Maher was based on the company's operations for the fiscal years ending November 30, 2005, to November 30, 2009, as well as a review of interim financial statements through January 31, 2010.

remaining value of $4,131,000. Maher then applied another seventeen percent discount for minority interest and a nine percent discount for nonvoting shares. At the time of the Maher valuation, the company had 2206 voting and 20,558 nonvoting common shares outstanding. Using these figures, Maher valued the voting stock at $150.44 per share and the nonvoting stock at $136.75 per share.

At the time of trial, Curtis held 190 shares of voting common stock and 244 shares[5] of nonvoting common stock in the family business. Under the Maher valuation, the voting stock was worth of $28,583.46 and the nonvoting stock was worth $33,367. Also according to Maher's calculations, Curtis held an additional $305,102.19 worth of equity in the company after the buy-out of his parents. In Maher's estimation, the total value of Curtis's interest in Bennett Machine was $367,052.65 ($28,583.46 + $33,367 + $305,102.19). Maher did not testify at trial. Curtis offered the valuation through his own testimony.

Dawn offered a competing appraisal at trial. She retained certified public accountant Ronald Nielsen of CliftonLarsonAllen, who performed two business valuations of Bennett Machine: one in May 2011 and one with more updated figures in April 2012. Nielsen determined the income approach to be the best proxy for the value of the company because a willing buyer would likely assess its worth based on earnings and cash flow.[6] Using that method, Nielsen determined, considering minority ownership, an equity value of $4,551,961 for the company. Applying a twenty percent marketability discount, Nielsen arrived

---

[5] Curtis received another 188 shares of nonvoting stock as a gift from his parents in December 2009, which was not included in the marital estate.

[6] The Nielsen appraisal used tax returns for fiscal years ending November 30, 2007, through November 30, 2010, and June 30, 2011.

at a minority, non-marketable value of $3,642,000 for Bennett Machine. Considering the shares outstanding on the date of the valuation, Nielsen testified he valued the shares of voting stock at $1994.63 each and the shares of nonvoting stock at $1894.90 each. Under Nielsen's calculations, Curtis had a net value of $378,980 in voting stock and $818,597 in nonvoting stock, for a total of $1,197,577 in value.

Nielsen testified he used essentially the same accounting principles in valuing the company as Maher did, but Maher's appraisal was completed two years earlier and Maher's calculations of value included shares that were redeemed shortly after Maher's report was finished. More than 22,000 shares of common stock were outstanding at the time of the Maher valuation, and by the time of the Nielsen valuation, the outstanding shares had decreased to 570 voting shares and 1600 nonvoting shares. Nielsen's valuation also used a lower marketability discount for both types of shares than the Maher valuation did. Nielsen explained: "it seems like our number is huge compared to theirs, but when you eliminate over twenty some thousand shares so that you have a very few number of shares outstanding that magnifies the value per share."

The district court accepted the Maher appraisal, despite the fact that it was "slightly older than the valuation" performed by Nielsen. The court found the Maher valuation "more persuasive and accurate based on the fact that, pursuant to the stock redemption agreement, it is required that the fair market value of stock must be valued using the same valuation principles and methods utilized in prior corporate valuations performed by Maher Economics, Ltd." The court

determined Curtis's stake in the family business was worth $367,052.65, and awarded all interest in Bennett Machine to Curtis. In light of that distribution, the court ordered Curtis to pay Dawn "the sum of $243,559 in cash within 120 days" of the filing of the decree.

After performing our de novo review, we disagree with the district court's adoption of the Maher valuation of Curtis's stock in Bennett Machine. That valuation was completed for a different purpose and before the redemption of the parents' stock. *See Moffatt*, 279 N.W.2d at 18. As Dawn argues on appeal: "it is illogical to accept a business valuation that does not consider all factors necessary to determine fair market value simply because family members agreed to use it for a completely separate purpose: to sell shares back to the company they own or to each other."

Although we are mindful of the leeway given district courts in arriving at a value for a family business, we are not without authority to modify the valuation when the facts require us to do so. *See Hoak*, 364 N.W.2d at 192–93. We believe the Nielsen valuation is a more accurate estimate of the value of Curtis's interest in his family's company at the time of the dissolution trial. Nielsen took into consideration the redemption of 20,000 shares of company stock, while Maher did not. Nielsen based his appraisal on the same accounting principles as Maher did, but used more up-to-date information and did not apply multiple discounts that would undervalue the stock held by Curtis and his siblings.

Because we adopt Nielsen's valuation, the total worth of the marital estate increases from the district court's determination of $760,843.97 to $1,235,126.50.

Equal division of the newly valued estate would provide each party with assets of $617,563.25. That amount, minus the $159,569.03 in assets awarded to Dawn in the decree, requires Curtis to make an equalization payment of $457,994.22. We modify the decree to increase Dawn's cash award from $243,559 to $457,994.22. Curtis shall satisfy this obligation within 120 days of issuance of procedendo concluding this appeal. As in the original decree, the amount shall not bear interest if paid within sixty days of that deadline.

### B. Spousal Support

Alimony[7] is an allowance paid by one spouse to the other in place of the payor spouse's legal obligation to provide support had the marriage continued. *See In re Marriage of Hansen*, 733 N.W.2d 683, 702–03 (Iowa 2007). Receiving alimony is not an absolute right. *In re Marriage of Becker*, 756 N.W.2d 822, 825 (Iowa 2008). Any award depends on the peculiar circumstances of each dissolution case. *Id.* at 825–26. The legislature has listed certain factors courts should consider when deciding the alimony question. *See* Iowa Code § 598.21A(1). Among those statutory factors, the following are pertinent in this case: the length of the marriage, the age and physical and emotional health of both parties, their educational levels and earning capacities, the property distribution, and the feasibility of the party seeking maintenance to become self-supporting at a standard of living comparable to that enjoyed during the marriage. *See id.*

---

[7] In 1980, the legislature replaced the term "alimony" with the phrase "spousal support" in the Iowa Code. But we still use the terms interchangeably in our case law. *In re Marriage of Ales*, 592 N.W.2d 698, 702 n. 2 (Iowa Ct. App. 1999).

Our cases discuss three types of alimony: traditional, rehabilitative, and reimbursement. *Becker*, 756 N.W.2d at 826. Each type of alimony has a distinct goal, though they can bleed over into one another. *Id.* at 827 (finding support award may be a combination of types and serve multiple purposes). The first two types of alimony are at issue here. Traditional alimony must be paid for the recipient's lifetime or for so long as the recipient is incapable of self-support. *In re Marriage of Sisson*, 843 N.W.2d 866, 875 (Iowa 2014). Rehabilitative alimony provides support to "an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005).

The district court ordered Curtis to pay rehabilitative alimony of $2000 per month for ten years following entry of the decree. The court focused on Dawn's age, her education, and "her obvious abilities" and concluded such financial support would enable her "to seek further education, if she so desires, in order to find replacement employment which will provide her with a good income."

Dawn contends equity requires us to modify that award to require Curtis to pay traditional alimony, that is, $2000 per month for the rest of her life or until she remarries or receives Social Security benefits. Curtis cross-appeals, contending the equitable result would be to reduce the duration of the alimony award to five years.

The length of the marriage is a key factor in deciding if traditional spousal support is merited. *Gust*, ___ N.W.2d at ___, 2015 WL 200056, at *7. While

neither the judicial branch nor the legislature have yet established a fixed formula, the shorter the marriage, the less likely a court is to award traditional spousal support. *Id.* Twenty years seems to be the tipping point for ordering traditional alimony. *Id.* Curtis and Dawn crossed that "durational threshold" of twenty years in this case.

In marriages of relatively long duration, the next step is to assess the payee spouse's need and ability. *Id.*, at *8. "[T]he yardstick for determining need has been the ability of a spouse to become self-sufficient at "a standard of living reasonably comparable to that enjoyed during the marriage." *Id.* (citing Iowa Code § 598.21A(1)(f)).

The Martins' decree included an insightful, albeit brief, analysis of the support question. While the court characterized the award as rehabilitative, and rightly so, the duration of the payments approaches the territory of traditional alimony. We see nothing wrong in the alimony award serving dual purposes. *See Becker*, 756 N.W.2d at 827. The duration of support may be limited if the evidence shows the payee spouse has the capacity to close the gap between income and reasonable needs. *Gust*, ___ N.W.2d at ___, 2015 WL 200056, at *9.

In fixing alimony, we look at what the parties have done with their careers. *In re Marriage of Clinton*, 579 N.W.2d 835, 839 (Iowa Ct. App. 1998). Although Dawn has a four-year degree, she has not pursued a career in the area of visual arts. Instead, she spent more than half of the marriage staying home to raise the couple's children. As our supreme court observed: "the economic consequences

of absence from the workplace can be substantial." *Gust*, ___ N.W.2d at ___, 2015 WL 200056, at *7.

Dawn and Curtis enjoyed a comfortable, though not lavish, lifestyle during the marriage. Since their separation, Dawn has suffered from situational depression. She has had trouble finding a new job because she was fired from Curtis's family business. She expressed interest in returning to college to obtain a teaching certificate. The decade-long duration of the alimony will allow her to do so, and will allow her to start a new career and become self-supporting at a standard of living comparable to that enjoyed during the marriage.

The district court appropriately took into account Curtis's much higher income, the property equalization settlement he owed to her, and the length of the marriage. Even given our modification of the equalization payment, we see no cause to lengthen or shorten the duration of the alimony award.

## C. Delay in Issuing Decree

The parties waited twenty-two months between the dissolution trial and the issuance of the decree. Both Dawn and Curtis claim the elapsed time caused them prejudice.

Dawn asserts the delay cost her more than $800 per month in child support and alimony over and above the amount required by the temporary order. She multiplies that amount by twenty-one months for a total of $16,920.96. She also points out that she lost "no less than fifteen months' interest she could have received on the funds" Curtis was required to pay to

equalize the property settlement. She asks that we order Curtis to pay child support and spousal support retroactively to July 1, 2012.

Curtis counters that the delay actually benefitted Dawn and prejudiced him. He points out that he continued to pay the mortgage, the real estate taxes and the insurance on the marital home at approximately $1250 per month. He points out he will continue to make those payments until the house is sold. He also asserts he should have been given credit for car payments he made on the vehicle awarded Dawn. Curtis asks us to adjust the duration of the alimony award to reflect his additional payments during the twenty-two month delay.

The delay in this case was unacceptable, but gratefully, a rarity in Iowa's trial courts. Because such a long delay does not often occur, neither party is able to cite persuasive authority for their proposed remedies. Moreover, to the extent each party's professed prejudice is more than speculation, the losses appear to cancel each other out. Accordingly, we decline to modify the decree based on the delay in its issuance.

### D.      Credit for Post-Decree Mortgage Payments

The district court ordered the parties to sell the marital home in Monticello and divide the net sale proceeds equally. The court directed the parties to list the property for sale with a local realtor as soon as possible, but did not set a minimum selling price.

In his cross-appeal, Curtis contends the district court erred in not allowing him credit for the reduction in principal on the outstanding mortgage on the marital home resulting from his post-decree payments. Curtis contends the court

has failed to compensate him for increasing equity he is contributing to the marital assets. He further asserts "without any parameters placed on a minimum selling price for the home, it is plausible Dawn could obstinately refuse a reasonable offer on the marital home and continue to reside there until such time the mortgage is completely paid by Curtis." Curtis cites an unpublished court of appeals case, *In re Marriage of Hoffman*, No. 04-0515, 2004 WL 2387431, at *2 (Iowa Ct. App. Oct. 27, 2004), to show he is entitled to credit for his post-decree payments reducing the mortgage principal.

Dawn offers several counter arguments, including that she should be credited for her "sweat equity" in maintaining the home, that further reduction in the principal increases the net equity for both parties, that Curtis ignores the positive tax consequences stemming from his mortgage payments, and that Curtis has been living in a home provided by his parents without any obligation to pay rent.

We find the district court's treatment of the marital home was equitable to the parties and decline to credit Curtis for the principal payments.

### E.  Post-secondary education payments

The district court reserved jurisdiction over the matter "for the purpose of determining each parent's respective share of their children's post-secondary educational expenses pursuant to Iowa Code sections 598.21F and 598.21(5A)." Curtis points out in his brief, because of the delay in filing the decree, the parties' eldest son is just months short of graduating from high school. Curtis asks us to remand so the district court may enter an order regarding the education subsidy.

Dawn agrees the matter should be remanded for a decision under section 598.21F(2). Based on the parties' joint request, we remand this matter to the district court for the purpose of determining the parents' share of post-secondary education expenses.

### F. Expert Witness Fees, Attorney Fees and Costs

At trial, Dawn asked for an award of $3150 for expert witness fees and $10,000 for trial attorney fees. The district court believed Dawn had "sufficient assets leaving the marriage to pay the remainder of her expert fees." The court noted Curtis had already paid $1000 toward the expert witness fees and $3000 of Dawn's attorney fees, and she paid another $2500 from a joint account. The court ruled each party should pay his or her own remaining attorney fees.

On appeal, Dawn contends we should find the district court abused its discretion in denying her request for fees, unless we modify the equalization payment. Given our modification of the equalization payment, we agree it would be inequitable to order Curtis to pay the remaining fees for Dawn's expert witness or her trial representation.

Dawn also filed a motion seeking appellate attorney fees. Dawn asked for $7500, including $1975 for the cost of obtaining the transcript. Curtis filed a resistance. Again, because we have modified the equalization payment, we find the parties should pay their own appellate attorney fees. *See In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013) (declining to award appellate attorney fees when parties' respective abilities to pay were comparable).

Because Dawn was the successful party on the primary issue raised on appeal, we tax the $1975 in transcription costs to Curtis. *See* Iowa Code § 625.9. We order the remaining appeal costs to be divided equally between the parties.

**AFFIRMED AS MODIFIED AND REMANDED.**