# IN THE COURT OF APPEALS OF IOWA

No. 15-1783
Filed September 14, 2016

IN RE THE MARRIAGE OF SARA ROSE CRANDALL
AND JONATHAN CHRISTIAN CRANDALL

Upon the Petition of
SARA ROSE CRANDALL, n/k/a SARA ROSE RIEGER,
          Petitioner-Appellee,

And Concerning
JONATHAN CHRISTIAN CRANDALL,
          Respondent-Appellant.
_____

JONATHAN CHRISTIAN CRANDALL,
          Plaintiff,

vs.

IOWA DISTRICT COURT
FOR LINN COUNTY,
          Defendant.
_____

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

Jonathan Crandall appeals the physical care and economic provisions of the dissolution decree. On certiorari, he challenges the court's contempt ruling.

**AFFIRMED AS MODIFIED, WRIT SUSTAINED.**

David D. Burbidge of Johnston, Stannard, Klesner, Burbidge & Fitzgerald, P.L.C., Iowa City, for appellant.

Karen A. Volz of Ackley, Kopecky & Kingery, Cedar Rapids, for appellee.

Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

Jonathan Crandall contests the decree dissolving his eleven-year marriage to Sara Crandall on three issues: (1) the denial of joint physical care, (2) the visitation schedule, and (3) the distribution of assets. He also brings a certiorari challenge to the district court's order finding him in contempt. Sara defends the decree and contempt order and asks for appellate attorney fees.

Because we agree with the district court's assessment that joint physical care would not serve the best interests of the five Crandall children, we affirm the grant of physical care to Sara. We also conclude the extraordinary visitation awarded by the district court assures the children continuous physical and emotional contact with both parents.

On the economic issues, we modify in part. We order Jonathan to pay Sara $39,144 to equalize the distribution of the parties' property, including an equal distribution of the assets Jonathan liquidated before trial for attorney fees and taxes. And in an abundance of caution, we modify the court's "no fault" provision applicable to Jonathan's unvested restricted stock grants to address concerns raised by Jonathan on appeal.

As to Jonathan's certiorari challenge to the court's contempt ruling, we sustain the writ. Finally, we award appellate attorney fees to Sara.

I.      **Facts and Prior Proceedings**

Sara and Jonathan married in December 2003 and divorced in July 2015. They have five children—ranging in age from three to ten years. The couple met at church while students at Iowa State University. Jonathan pursued studies in engineering, earning both bachelor's and master's degrees. Despite taking time

off to care for their first child, Sara earned her bachelor's degree. The couple purchased their first home in Huxley assisted by a $10,000 gift from Sara's grandmother.

During their marriage, Jonathan worked full-time as an electrical engineer, while Sara acted as the primary caretaker for the children. The couple belonged to a church that encouraged them to pursue traditional gender roles and to provide home-schooling for their children. Home-schooling was important to Jonathan because that was how he received his education growing up. Sara home-schooled the three oldest children while caring for their fourth child and managing the family's day-to-day finances. Jonathan engaged in many activities with the children on weekends, including church-related functions. Shortly after their fourth child was born in 2009, the family moved from Huxley to Marion.

After the move, Jonathan worked as an engineer for Rockwell Collins but continued to help with the children in the evenings and on weekends. In August 2010, Jonathan transferred to Skyworks Solutions, where his hours were more demanding. On top of his work schedule, Jonathan devoted time to repairing and updating a rental home in Cedar Rapids the parties bought as an investment in 2011. When their fifth child was born in March 2012, Sara found it impossible to keep up with the home-schooling and the mounting responsibilities of the busy household. In March 2013, she approached Jonathan about enrolling the children in public school. Jonathan was disappointed about the decision, but he agreed they needed the support of the public school system.

The parties separated in the summer of 2013. The separation followed Jonathan's Fourth-of-July arrest for operating while intoxicated and his

subsequent revelations to Sara that he had not been truthful about time spent at bars and strip clubs. Sara filed a petition for dissolution on October 15, 2013. After she filed for divorce, Sara noticed Jonathan started to engage more in hands-on childrearing, to the extent she perceived him trying to "beat her to the punch" in completing certain chores. Jonathan also took the step of applying for a "temporary writ of injunction" preventing either party from disposing of marital assets; the district court granted the injunction on October 31, 2013.

For almost one year after Sara filed for divorce, she and Jonathan lived under the same roof. During this time, Sara started classes at the University of Iowa to earn her teaching certificate. By the summer of 2014, Sara found the cohabitation "unbearable" and asked Jonathan to move out. He refused, so Sara moved into a house purchased by her grandmother. Sara applied for temporary orders on custody, physical care, visitation, child support, and attorney fees. On August 8, 2014, the court issued an order on temporary matters, rejecting a fifty-fifty shared care arrangement because Jonathan's schedule was not flexible and routinely required more than a forty-hour work week, while Sara's class schedule took her away from home less than twenty hours a week. The temporary order did afford Jonathan time with the children that exceeded the threshold for extraordinary visitation.

Also while the dissolution proceedings were pending, Jonathan's parents moved from Dubuque to Cedar Rapids, so they could be more available to help babysit for their grandchildren. Sara was not in favor of their move and "sat down with them to explain that this made [her] very uncomfortable." She testified

she believed Jonathan and his parents maintained a "much more conservative and rigid value system" than she had come to follow.

Sara filed an application to show cause in February 2015, alleging Jonathan violated the temporary injunction by selling stock and depleting marital assets.

The district court held the dissolution trial on April 15 and 16. The parties disputed physical care, visitation, child support, spousal support, and distribution of assets. The court also heard testimony concerning Sara's contempt allegations. In the decree issued on July 22, 2015, the court granted the parties joint legal custody and placed physical care with Sara with extraordinary visitation for Jonathan. The court directed Jonathan to pay $1933.81 in monthly support for the five children and $1600 in monthly spousal support for five years. Before dividing the parties' assets, the court set aside the $10,000 gift from Sara's grandmother, received in 2005, as exclusively Sara's property. Jonathan does not dispute the gift on appeal. The court then divided the parties' major assets and ordered Jonathan to make an equalization payment to Sara in the amount of $25,771.41.

The court also found Sara proved beyond a reasonable doubt that Jonathan failed to obey the court's October 31, 2013 injunction by liquidating $62,586 in stock in 2014 and another $16,946 in stock in 2015.

The parties filed motions under Iowa Rule of Civil Procedure 1.904(2), which the district court granted in part on October 12, 2015. Jonathan then filed a notice of appeal, as well as a petition for writ of certiorari on the court's

contempt finding. The supreme court granted his petition. This opinion will address both Jonathan's direct appeal and his certiorari claim.

## II.    Scope and Standards of Review

We review dissolution proceedings de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). While we decide the appellate issues anew, we give weight to the district court's findings of fact. *Id.* When it comes to witness credibility, "[t]here is good reason for us to pay very close attention to the trial court's assessment." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984). The trial judge "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974). On appeal, we must rely on the transcript and necessarily forfeit the impressions created by the parties' demeanors. *Vrban*, 359 N.W.2d at 423.

We review Jonathan's allegations concerning the contempt finding for errors at law. *See Ary v. Iowa Dist. Ct*, 735 N.W.2d 621, 624 (Iowa 2007). We find error if the district court's factual findings are not supported by substantial evidence or if the court has not properly applied the law. *Id.*

## III.    Analysis of Jonathan's Appeal Issues

### A.  Joint Physical Care

The first question in Jonathan's appeal is whether the district court should have honored his request for joint physical care of their five children. Physical care is a distinct concept from legal custody. Legal custody requires parents to make significant decisions about their children's legal status, medical care, education, extracurricular activities, and religious instruction. Iowa Code

§ 598.1(3), (5) (2015); *see also In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). Physical care involves the parents' obligation and opportunity to maintain a home and provide routine care for their children. Iowa Code § 598.1(7); *Hansen*, 733 N.W.2d at 690–91 (explaining physical-care parent must navigate "the myriad of details" associated with everyday childrearing, including what clothes the children wear, when they go to bed, and with whom they associate).

An award of joint physical care requires divorced parents to work closely together to coordinate the myriad of everyday details. That is why when deciding if joint physical care is in the children's best interests, we must consider the continuity of caregiving, the ability of the divorced parents to communicate and show mutual respect, the degree of conflict between them, and the degree to which they are in general agreement about their approach to daily parenting matters.[1] *See Hansen*, 733 N.W.2d at 696–99.

Sara and Jonathan agreed to joint legal custody and the district court determined that designation was in the best interests of the children. The point of disagreement was Jonathan's request for joint physical care (often referred to as shared care). When the court denies a parent's request for joint physical care, its denial must be accompanied by specific findings of fact and conclusions of law explaining why shared care is not in the children's best interests. Iowa Code § 598.41(5)(a).

---

[1] In deciding appropriate physical care, we also consider the factors listed in Iowa Code section 598.41(3).

The district court provided that glimpse into its thought process, calling the question of joint physical care "both difficult and close." In the court's opinion, "[b]oth parents love the children very much and both parents adequately provide for the physical care needs of the children." The court had "no concerns about the physical well-being of the children while they are in the custody of either parent." But the court ultimately decided the *Hansen* factors tipped the scales away from a shared-care arrangement, pointing to the parties' difficulty in successfully communicating and their differing philosophies "as to the role of each spouse in a marriage and in the raising and caring for children." The court also concluded, "Sara's perception that Jonathan does not respect her as an equal is not unwarranted." After denying Jonathan's request for shared care, the court awarded physical care to Sara, continuing the extraordinary visitation afforded Jonathan since the temporary order.

On appeal, Jonathan renews his request for joint physical care. He does not alternatively ask for physical care to be placed with him. Jonathan contends he and Sara have effectively communicated about their children since the separation, their parenting philosophies are not that different, and isolated incidents of his disrespect toward Sara are not indicative of their ongoing relationship.

Although the record confirms both Sara and Jonathan are loving and capable parents, we agree with the district court's insightful conclusions and ultimate decision that joint physical care is not in the best interests of their five children. The children will experience greater stability and continuity in the physical care of Sara with liberal visitation for Jonathan; this arrangement most

closely approximates the proportion of time spent with each parent before the separation. *See Hansen*, 733 N.W.2d at 683 (focusing on historical patterns of caregiving as one factor in joint-physical-care decision). We acknowledge Jonathan's point that both he and Sara have made concerted efforts at communicating for the sake of their children, especially regarding academic and extracurricular activities. But we are concerned Jonathan has not consistently accorded Sara the same level of respect she has shown him. *See id.* at 698 ("Evidence of controlling behavior by a spouse may be an indicator of potential problems."). Specifically, we find it telling that after the parties separated, Jonathan changed the password on their financial accounts, implemented a process where *he* would designate and deposit "a lump sum into the checking account for groceries and gas and things for the kids," and had members of their church "go through [her] bank accounts to see how she was spending every dime."

We also credit Sara's testimony that they did not agree about their approach to daily parenting matters. She testified: "[W]e have different values about discipline. I have had time with the kids to sort of develop the skills of dealing with five small children . . . . [H]e tends to be permissive until he blows up." *See id.* at 699 (noting "parents must generally be operating from the same page on a wide variety of routine matters"). Considering all the pertinent factors, we reach the same decision as the district court concerning joint physical care.

## B. Visitation

Given our decision to affirm the district court's denial of joint physical care, Jonathan asks for additional visitation comparable to his proposal for the children

to alternate between three- and four-day stretches with each parent. Sara urges us not to disturb the visitation in the decree. She notes the schedule proposed by Jonathan relies heavily on his parents to take care of the children at times when Sara is available to care for them.

Continuing the extraordinary visitation provided to Jonathan in the temporary order, the decree provides:

> Jonathan shall have physical care of the children every other weekend from Thursday after school (or 3:30 p.m.) until the following Monday morning at the start of school (or 8:30 a.m.); and, during the alternate week, every Wednesday from after school (or 3:30 p.m.) until the following morning at the start of school (or 8:30 a.m.).

The decree's alternating midweek and weekend visitation schedule, in addition to alternating holidays and spring breaks, is in the children's best interests and provides them meaningful and sustained time in their father's care. *See In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000) (noting chapter 598's supposition that it is generally in children's best interests to have the opportunity for maximum continuous physical and emotional contact with both parents can be satisfied by liberal visitation in various forms). All the witnesses at the dissolution hearing testified the children are doing well under the existing schedule. We affirm the district court's visitation schedule.

**C. Property Division**

Jonathan also challenges the economic provisions of the dissolution decree. He claims the court erred in valuing and distributing vested and unvested assets associated with his employment at Skyworks. Concerning his equalization payment to Sara, Jonathan contends the court should have ordered

the sale of his property and allowed him to deduct taxes and costs. He also faults the court for granting Sara access to his financial information.

### 1. Property and Jonathan's Vested Stock

The district court must divide marital property "equitably between the parties," in consideration of the thirteen factors listed in Iowa Code section 598.21(5). The division does not need to be equal or follow a certain percentage; rather, the court should make a just award under the circumstances. *In re Marriage of Hoak*, 364 N.W.2d 185, 194 (Iowa 1985).

Most of the information regarding assets and liabilities came from Jonathan. The valuation and distribution of the parties' real estate[2] and cars is not disputed. The court awarded Sara her Roth IRA.[3] At trial, Jonathan proposed the court value his vested stock assets (stock options, restricted stock grants, ESPP stock) at *market value* at the time of trial, divide the value of his stock assets equally as shown in his Exhibit BBB, and order him to pay $31,877 to Sara to equalize the property distribution.

The court adopted Jonathan's valuations and also adopted his proposal to equally split his vested stock assets[4] based on the market value Jonathan

---

[2] Jonathan's father holds the $44,000 mortgage on the rental property.

[3] Jonathan proposed splitting equally his IRA ($50,155.94) and 401K ($107,894.86). The court agreed, ordered those assets divided by QDRO, and neither party appeals that resolution. *See In re Marriage of Veit*, 797 N.W.2d 562, 564 (Iowa 2011) ("[T]he QDRO is not itself a property settlement, but is merely a method of effectuating the property division.").

[4] Jonathan testified his Employee Stock Purchase Plan (ESPP) account held shares of Skyworks stock that he owned and he could immediately sell these shares. As to Jonathan's separate account holding restricted stock, he explained:

> The company issues stock awards based on company performance, as well as personal performance in my job, and it's an award that tries to motivate [me] to keep doing a good job and stay at the company because it vests between a three- and four-year period. So

provided. When we exclude Jonathan's stock options, which the court awarded separately in its later ruling on Jonathan's rule 1.904(2) motion, the following table shows the valuation and division of the these assets:

| Asset | Sara | Jonathan |
|---|---|---|
| Homestead | | 223,000 |
| Homestead Debt | | -153,300 |
| Rental | | 47,000 |
| Rental Debt | | -44,000 |
| 2006 Odyssey | 8741 | |
| 2000 CRV | | 1710 |
| Sara Roth | 24,326 | |
| J's Restricted Stock | 65,289 | 65,289 |
| J's ESPP | 9410 | 9410 |
| **Net Assets** | 107,766 | 149,109 |
| | | |
| **Equalization** | **20,671** | **-20,671** |
| Property Division | 128,437 | 128,438 |

The court also set aside the $10,000 gift Sara had received from her grandmother and ordered Jonathan to pay Sara the $10,000 as a part of the equalization payment. Therefore, when we add the $10,000 gift to the above valuation and distribution, we conclude Jonathan should pay Sara $30,671,[5] an amount lower than the $31,877 he proposed paying at trial.

On appeal, Jonathan first claims the court inequitably distributed his vested stock assets (restricted stock and ESPP stock). Without citation to authority, he argues the distribution "must explicitly state that the parties are not

each stock grant . . . is a grant of a certain number of [Skyworks] shares, and [then] a certain number of shares are released as a percentage of the total each year. And so as the shares vest, they get credited to my account, and I have the freedom to sell them immediately for income or hold them as an asset and sell them much later for capital gains.

[5] The court ordered Jonathan to pay Sara $25,771.41, which total included the $10,000 gift. The court did not explain its calculation. We conclude the appropriate equalization payment for these accounts plus the gift is $30,671. In our discussion of the contempt action below, we increase the overall equalization payment to $39,144, based on Jonathan's liquidation of assets in 2015.

awarded a specific dollar amount but are awarded one-half of the stocks existing at the time of trial regardless of whether their value has increased or decreased from the values at the time of trial." In making this argument on appeal, Jonathan abandons the dollar values assigned to the stock in his own property distribution proposal and also abandons his proposal that the value of the those assets be split equally to determine an appropriate equalization payment.

We recognize "the general rule that stock should be valued at market value if it can be ascertained." *Id.* at 192. When the district court's valuation is within the permissible range of evidence, we will accept it. *Id.* at 192–93. Upon our de novo review, we accept the district court's valuations based on Jonathan's evidence. *See In re Marriage of Moffatt*, 279 N.W.2d 15, 19 (Iowa 1979) ("We need not arrive at an exact value. The purpose of determining value is to assist the court in making equitable property awards and allowances."). We modify the decree to order Jonathan to pay Sara $30,671 to equalize the asset distribution. *See Hoak*, 364 N.W.2d at 194 (declining request to transfer stock shares as a part of the distribution of property).

Second, Jonathan argues the district court failed to properly account for the tax implications of his equalization payment because the court did not order him to sell an asset. Jonathan asserts the only assets available to him for this payment are his vested stock grants or vested stock options. He asks us to modify the decree to order the sale of stock options in the amount of the equalization payment. He proposes to then pay Sara "the *net* amount after taxes." Sara responds Jonathan is not limited to those assets and can make this payment by refinancing the home mortgage.

In making a property division we consider the tax consequences a party is expected to face *in satisfying* a property settlement. *See* Iowa Code § 598.21(5)(j). Our supreme court has instructed: "'[W]here there is no evidence to support a discounting based on a sale and the trial court has not ordered a sale, the effect of considering income tax consequences on a sale' diminishes the value of the asset to the nonowning spouse." *In re Marriage of McDermott*, 827 N.W.2d 671, 684 (Iowa 2013) (quoting *In re Marriage of Friedman*, 466 N.W.2d 689, 691 (Iowa 1991)) (stating if a dissolution court *orders* a sale of an asset, it may then consider the tax consequences in its property distribution); *Friedman*, 466 N.W.2d at 691 (stating tax consequences are not considered when there is no evidence "a sale was pending" and the district court "has not ordered a sale"); *In re Marriage of Hogeland*, 448 N.W.2d 678, 680–81 (Iowa Ct. App. 1989) (stating where equalization payment will require the liquidation of capital assets, the income tax consequences of the sale should be considered).

The district court presumably believed Jonathan had sufficient cash flow to make the mortgage payments and satisfy the equalization payment. Jonathan has not shown he is unable to refinance the mortgage ($67,000 equity) and make the equalization payment. Jonathan also could use a portion of his salary and incentives (as of March 3, 2015—$100,656 base salary; 2014—$97,639 base salary plus $71,000 performance bonus). Further, Jonathan included in his monthly expenses the children's taekwondo lessons, new hefty allowances for the children, and their piano lessons. We also note his 2014 purchase of new Samsung Galaxy tablets for the children. On cross-examination, Jonathan admitted those costs "are not necessary monthly expenses." By spending this

money and including these costs as necessary monthly expenses, Jonathan artificially lowered his cash flow. Because Jonathan has not shown he is unable to refinance the mortgage, the evidence does not support Jonathan's assertion he would be forced to exercise and liquidate vested stock assets to pay Sara, and we decline Jonathan's request.

## 2. Jonathan's Stock Options.

Jonathan's vested stock options, granted when he started work in August 2010, allow him to buy 2500 shares of company stock at the strike price ($17.13). At trial, Jonathan explained exercising the options would be a taxable event because he owned the options, not the shares of stock. Jonathan asked the court to order him to exercise all the options, obtain the net value, and split the net value with Sara.

While the decree assigned Jonathan's proposed value as his profit in the stock options ($198,450) and divided that value equally between the parties, the court failed to further specify distribution of this asset. In Jonathan's rule 1.904(2) motion, he asked the court to modify the decree,[6] asserting his vested stock options "are not a retirement account and cannot be split by a QDRO. They can only be distributed to [Sara] by [Jonathan] exercising them, and then paying income taxes on the amount received." Jonathan asked the court to award each party 1250 stock options. According to Jonathan, the court should further order him "to exercise [Sara's] 1250 shares, have an accountant determine the amount of income taxes [Jonathan] shall pay on this amount, and

---

[6] Jonathan's 1.904(2) motion did not address his two other vested assets—the vested restricted stock ($130,578) and the ESPP ($18,819).

pay [Sara] this net amount." Finally, Jonathan asked the court to order him "to provide to [Sara] all needed access to the relevant records of the plan administrator, the account, and the accountant."

The court's October 12, 2015 order granted Jonathan's motion in part, noting its intent for the parties to share equally "any transaction costs, including tax liability, incurred by exercising these options." The court ordered Jonathan to accomplish "an equal division in one of two ways: First, if possible, [Jonathan] shall transfer one-half of the actual vested units to Sara." Second, if not possible, Jonathan "shall complete all paperwork necessary to allow [Sara] access to all information regarding the vested stock option account(s)." Under the second option, the court gave Sara sixty days to obtain information and advice and to "elect to either (A) require [Jonathan] to exercise the option on one-half of the units and give [her] the net proceeds" or "(B) continue to hold all the vested stock options jointly and be entitled to one-half of the net proceeds of each option unit as it is exercised." The court specified, if Sara picked option (B), then she had "the continued right to complete access to the account information."

On appeal, Jonathan asks us to modify the district court's orders regarding Sara's access to his financial information to state: "Jonathan will provide Sara with all quarterly statements of the vested stock options, vested stock grants, and unvested stock grants that existed at the time of the decree. He shall be permitted to redact from such statements, any and all financial information regarding post-decree financial information."

We decline his request. The district court's rulings make it clear Sara only has access to information concerning Jonathan's financial assets at the time of

dissolution. No modification is needed for Jonathan to redact information regarding his later-acquired assets.

### 3. Jonathan's Unvested Restricted Stock Grants.

Jonathan's restricted stock vests on a deferred timetable set at the time his employer granted the shares to him. The final vesting will occur on November 10, 2018, four years after the November 2014 grant of shares. Regarding both Jonathan's *vested* restricted stock grants (included in the equalization analysis above) and his *unvested* restricted stock grants, his exhibit provided:

| Grant Date | Status | Granted | Sellable | Unvested | Vested | Shares Traded for Taxes |
|---|---|---|---|---|---|---|
| 09/06/2011 | N/A | 1000 | 479 | 0 | 1000 | 383 |
| 11/10/2011 | Accepted | 1000 | 479 | 250 | 750 | 217 |
| 11/08/2012 | Accepted | 1250 | 395 | 624 | 626 | 231 |
| 11/10/2014 | Accepted | 1000 | 0 | 1000 | 0 | 0 |

Thus, the restricted stock at issue was *granted* to Jonathan by his employer during the marriage, but some shares, though already granted, were unvested at the time of the dissolution. In general, "[v]esting provisions vary considerably" as to "the point in time at which vesting will occur (immediately vs. deferred)." *In re Marriage of Benson*, 545 N.W.2d 252, 254 (Iowa 1996). At trial, Jonathan testified to his willingness to divide the unvested restricted shares equitably with Sara if a means to do so existed:

> Q. If you could give them to Sara, would you give them to Sara? A. I would divide them with Sara equitably.
> Q. If they're worth nothing, would you give them to Sara? A. . . . . You're saying if there was a legal means to divide an asset like . . . an unvested stock grant? I would divide them with Sara, as I've proposed dividing every asset in this case, 50/50.

The district court adopted Jonathan's valuation of the unvested restricted shares ($180,859.74) and devised a plan to equitably divide this asset:

> Jonathan is ordered to identify the individual number of shares in unvested stock grants he holds as of the date of this decree. Hereafter, each year when a number of these grants vest, Jonathan shall transfer half the value to Sara. This pattern will continue until all identified stock grants vest, or until the grants no longer exist through no fault of Jonathan. Jonathan is ordered to keep Sara informed of the status of these stock grants and to provide her copies of all documentation he is provided by his employer regarding these grants.[7]

Thus, the district court granted Sara an equal portion of the unvested restricted stock *only if* the shares granted during the marriage actually vested in the future.

**(a) Marital Estate.** On appeal, Jonathan first claims this asset is not a part of the marital estate, pointing out he could not cash out the unvested restricted shares at the time of trial and will only obtain these stock shares "if he continues to work there at the preset vesting date."

We divide the property the parties own at the time of the dissolution, and his employer granted him these restricted shares during his pre-dissolution employment. Thus, the facts of the existing grants, their value at the time of trial (from Jonathan's exhibit), and their potential for vesting in the future are undisputed. Jonathan has not cited any authority for his claim we must reverse the district court and rule this asset is not a part of the marital estate. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite an authority in support of an issue may

---

[7] Based on the $180,859.74 value and on describing the asset as unvested, it is clear the court is discussing the unvested stock *grants* in this paragraph. But the court inadvertently used the phrase "unvested stock *options*." As Jonathan testified, all of his 2010 stock options have now vested. We have corrected the court's inadvertent phrasing without notation.

be deemed waiver of that issue."). Thus, he has failed to show us why the district court's inclusion of this property was wrong.

The following treatise contravenes Jonathan's position:

> To the extent the employee does not receive an unvested benefit if the employee leaves the employer after the divorce, the remedy is not to refuse to divide the benefit, but rather to divide it on a deferred percentage basis, so that the nonowning spouse receives a stated percentage of any value which does ultimately vest. If a . . . contract right acquired during the marriage does not ultimately produce value, no value should be divided; but the fact that such a contract right *might* not produce value is no basis for concluding in advance that the contract right *will* not produce value. The uncertainties . . . should affect only the method of distribution; they should not be sufficient to prevent the court from considering the [contract right] as potentially divisible *property.*

2 Brett R. Turner, *Equitable Distribution of Property* § 6:48 (3d ed. 2015). Courts from other jurisdictions have treated similar unvested benefits as marital property. *See, e.g.*, *In re Marriage of Miller*, 915 P.2d 1314, 1319–20 (Colo. 1996) (en banc) (stating because husband had already earned the right to receive the restricted shares in the future, the shares are "a form of deferred compensation and thus constitute marital property"); *Chebhab v. Hamilton-Chehab*, 45 So. 3d 533, 535 (Fla. Dist. Ct. App. 2010) (noting wife's shares of restricted stock granted during the marriage vest and expire at different times, including post-decree, and unvested shares are "in the nature of deferred compensation" and "a marital asset"). *But see Davidson v. Davidson*, 578 N.W.2d 848, 853–56 (Neb. 1998) ("Stock retention shares are stock shares that are unvested when granted" and unvested shares vesting only upon continued employment "are not a part of the marital estate").

Iowa case law also has recognized future interests may be included in the marital estate. *See In re Marriage of Schriner*, 695 N.W.2d 493, 498–99 (Iowa 2005) (stating, similar to pensions, "a future interest is properly considered as a marital asset subject to distribution"); *In re Marriage of White*, 537 N.W.2d 744, 747 (Iowa 1995) (stating a court may divide future book royalties conditioned on author-spouse's performance of post-decree promotional services by a decree that "divides the funds when received"); *In re Marriage of Howell*, 434 N.W.2d 629, 632 (Iowa 1989) (stating Iowa law normally views pensions as property because they are a form of deferred compensation accrued during the marriage); *In re Marriage of Duggan*, No. 01-1887, 2002 WL 31423683, at *2 (Iowa Ct. App. Oct. 30, 2002) (including husband's deferred compensation in the marital estate).

Jonathan acquired a right to the restricted shares during the marriage, and he has not convinced us the district court erred in considering these shares a part of the marital estate.

**(b) "No fault" provision.** Noting the last stock grant will vest on November 10, 2018, Jonathan also challenges the court's "no fault" language in its distribution of this asset. He points out the provision seems to account for unvested restricted stock grants that do not eventually vest on the preset timetable due to (1) his employer revoking the grant, (2) Jonathan being laid off due to company issues, or (3) "Jonathan being unable to work for some no-fault reason." We agree the court's language encompasses these situations. But, Jonathan also claims the court has made him an "indentured servant to his current employer" until November 10, 2018. He asks us to eliminate the court's

"fault" provision and instead order him to pay Sara only if "they actually do vest regardless of the reason."

We do not believe the court's "no fault" language precludes Jonathan from switching employers if he has the opportunity to improve his employment situation before the November 2018 vesting date. Similarly, if Sara moves away and then Jonathan follows and moves to be near his children, Jonathan obtaining new employment in those circumstances would not trigger the court's "no fault" language. We decline Jonathan's request to completely strike the court's "fault" provision. But to the extent the court's "no fault" phrasing is unclear, in an abundance of caution we modify the decree by expanding the provision to specify it encompasses (1) Jonathan's employer revoking these grants, (2) Jonathan being laid off due to company issues, (3) "Jonathan being unable to work for some no-fault reason," (4) Jonathan moving to be near his children if Sara moves away, causing Jonathan to seek and obtain new employment, and (5) Jonathan switching employers because he has the opportunity to improve his employment situation before the final November 2018 vesting date.

## IV.    Analysis of Certiorari Challenge to Contempt Order

Jonathan alleges the district court acted illegally or exceeded its jurisdiction in finding him in contempt for liquidating $62,586 in stock in 2014, given the fact that at trial Sara limited her contempt claim to $16,946 in stock withdrawals in 2015. Jonathan also contests the finding that he willfully defied a court order in making the 2015 withdrawals. We agree with Jonathan and sustain the writ.

Shortly after Sara filed for dissolution, Jonathan sought and received a temporary injunction prohibiting the sale of assets. The court order prohibited the parties from:

> Selling, spending, disposing of, encumbering, destroying, damaging, transferring to third parties, or converting any asset . . . except each party may make expenditures needed for regular and ordinary living expenses, reasonable legal fees, and expenses for this case. Each party may make expenditures for ordinary expenses in the normal course of the parties' business.

Sara filed a rule to show cause when Jonathan's 2014 documents showed the receipt of over $60,0000 above his salary, believing he had cashed out stock holdings in violation of the injunction. At trial Jonathan testified $62,586 in shares vested in 2014, resulting in a tax obligation, but he did not request or receive a $62,586 cash payout. He also admitted making two smaller liquidations in January and March 2015. After Jonathan provided additional information, Sara agreed he did not cash out more than $60,000 in 2014, and during the trial she amended her contempt allegations to Jonathan's liquidation and withdrawal of $2898 in January 2015 and $14,048 in March 2015, or $16,946.

In his certiorari challenge, Jonathan asserts he used the 2015 withdrawals to pay his attorney fees for the dissolution action and the 2014 income taxes he owed. He contends these expenditures were allowed by the injunction. Sara argues Jonathan did not present evidence he was unable to pay his living expenses and attorney fees without selling the stock and did not apply for court permission to liquidate these assets for these purposes.

Based on the language of the injunction "excepting" reasonable legal fees and ordinary living expenses, such as paying one's income taxes, we conclude Jonathan's liquidation did not constitute a willful violation of the injunction. Accordingly, we sustain the writ. But that determination does not fully conclude the matter. Sara also owed attorney fees and had ordinary household expenses during this time, and Jonathan did not include his liquidated assets in his valuations and did not split these assets equally upon liquidation. Therefore, we conclude Jonathan must pay Sara $8473 (one-half of $16,946) in his equalization payment. Thus, Jonathan's equalization payment to Sara now totals $39,144 ($30,671 + $8473).

## V.    Appellate Attorney Fees

Sara asks for appellate attorney fees in the amount of $6810. Such an award rests in our discretion and is based on the merits of the appeal, the parties' needs, and their ability to pay. *See Sullins*, 715 N.W.2d at 258. After considering all appropriate factors, we order Jonathan to pay $5000 of Sara's appellate attorney fees. Jonathan is assessed the costs of this appeal.

**AFFIRMED AS MODIFIED, WRIT SUSTAINED.**