# IN THE COURT OF APPEALS OF IOWA

No. 16-2111
Filed January 24, 2018

**IN RE THE MARRIAGE OF CATHY L. TIESKOETTER
AND MARK F. TIESKOETTER**

**Upon the Petition of
CATHY L. TIESKOETTER,**
        Petitioner-Appellee,

**And Concerning
MARK F. TIESKOETTER,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Dubuque County, Monica L. Ackley,

Judge.


        Mark Tieskoetter appeals the economic provisions of his decree dissolving

his marriage to Cathy Tieskoetter. **AFFIRMED AS MODIFIED.**


        Stuart G. Hoover of Blair & Fitzsimmons, P.C., Dubuque, for appellant.

        Jennifer A. Clemons-Conlon of Clemons, Walters, Conlon, Runde & Hiatt,

L.L.P., Dubuque, for appellee.


        Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Mark Tieskoetter appeals the economic provisions of his decree dissolving his marriage to Cathy Tieskoetter. Upon our de novo review, we affirm the district court's ruling as modified.

## I. Standard of Review.

Because the district court hears dissolution-of-marriage proceedings in equity, our review is de novo. *See In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016); *see also* Iowa Code § 598.3 (2016); Iowa R. App. P. 6.907. This requires examining the entire record and adjudicating the issue of the property distribution anew. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Nevertheless, we give weight to the district court's factual findings, especially with respect to the credibility of the witnesses. *See id.*; *see also* Iowa R. App. P. 6.904(3)(g). Ultimately, the ruling will not be disturbed unless there has been a failure to do equity. *See Mauer*, 874 N.W.2d at 106.

## II. Background Facts and Proceedings.

Mark and Cathy were both born in 1954, and they married in 1975. They have one adult son. Both parties inherited sums of money during the marriage; Cathy inherited approximately $86,000 in the late 1990s and early 2000s, and Mark inherited approximately $282,000 in 2015. Some of Cathy's inheritance was spent over the years on improvements to the marital home, refinancing, and gifts to Mark and her son.

In November 2015, Cathy filed a petition for dissolution of marriage. At that time, Cathy was working thirty-two hours a week as a nurse, with an income of approximately $51,000 per year. Mark was self-employed as a direct importer and

contract manufacturer, which included purchasing and sales. Before self-employment, Mark worked for a company as an importer and contract manufacturer, and he made approximately $65,000 in 2010. In 2011, he began building his own business while working full-time, earning a total income of $77,000 in 2011 and $109,000 in 2012. Mark left his employment mid-2013, and he has continued to operate his own business since. Mark's income was approximately $139,000 in 2013, $75,000 in 2014, and $100,000 in 2015.

Trial in the case commenced in August 2016. Cathy testified things sort of fell apart in April 2015. Mark told Cathy he was flying to Las Vegas for his sixty-first birthday for some rest and relaxation, alone. At that time, most of their money was commingled. Cathy learned the trip involved two airline tickets, and there were numerous expenses that looked like they were for more than one individual, including show tickets, two-person meals, and $2700 at a spa-type place. Cathy began looking into their finances and found numerous cash withdrawals from bank accounts, charges to credit cards, and other transfers of money that substantially changed over the years. For instance, the marital savings account showed numerous cash withdrawals over the years, and from December 2012 to December 2015 alone, there had been at least $25,797 withdrawn from that account of which she was unaware. When Cathy asked Mark about the withdrawals, he told her it "was none of [her] business, . . . [she] worried about it too much, and that [Mark] would let [her] know if [they] were ever in financial trouble." Cathy testified there were also unusual charges on their credit-card statements, testifying that at least $36,000 of marital money was missing or spent without explanation from December 2012 to December 2015.

Cathy believed Mark had dissipated these assets, and she requested to be compensated for the dissipation. During discovery in the case, Cathy asked him about certain 2015 withdrawals. Cathy testified she learned from Mark's answers that he had spent over $14,000 from their marital savings account to help someone she did not know "get out of [an] abusive situation." Cathy testified that since she filed the dissolution petition, Mark had reimbursed the marital account $14,000 from his inheritance account, but she and her attorney did not believe that $14,000 figure accounted for everything that had been taken, including "the cash withdrawals that ke[pt] disappearing, or the trips and all that other stuff that's on the credit card." Cathy believed Mark may have been hiding money.

Cathy also testified she believed Mark was minimizing his income to avoid spousal support. Mark's financial affidavit, signed at the end of December 2015, reported his gross income was $140,000 per year. In his answers to interrogatories, signed and dated January 2016, Mark stated he expected "to have gross income [t]his year of approximately $139,000." Nevertheless, at the time of trial, Mark projected his 2016 income would only be $80,000. Cathy requested Mark pay her $2800 per month in spousal support. She also requested Mark be required to maintain "the $550,000 death benefit policy that he currently has in place" and to contribute to her attorney fees.

Mark admitted he had been "helping out" his friend's thirty-one-year-old daughter that lived in Wisconsin, and he denied they had a romantic relationship. He knew from a conversation with her mother that the young woman needed money, and he wanted to help her out. He testified he initially hired the young woman to do some work around his house and yard. He could not recall how much

he paid her for the work, but he did not "think it was quite $5000." Mark testified he paid the young woman "out of our household money, because [the work was] for the house." This amount was in addition to the $14,000 he had spent and repaid to the marital savings account. Mark testified the $14,000 he spent was given to the young woman in cash and in gifts, and the gifts included payment of her rent and a deposit, furniture, clothes for her children, and a purchase from Coach. Mark testified he did not live with the young woman in Wisconsin, but he admitted he had signed her apartment's lease and was "consistently paying the rent out of [his] inheritance." Mark further testified he hired the young woman to work for his business and had paid her $6400 as a contract employee, and then brought her on as a full-time employee with a salary of $50,000 per year. He had paid her an additional $16,898.51 through 2016. He testified he believed "you've got to spend money to make money, and that's what [he's] doing with [the young woman] right now." He still had approximately $172,000 left from his inheritance.

Regarding the cash withdrawals from the marital savings account, Mark testified that part of his job as a salesman required him to travel. Mark explained that when he was on the road, he withdrew cash to have on hand in case of an emergency, which accounted for most of his withdrawals. Mark also testified some of the larger cash withdrawals went to pay the young woman's mother for work she had done for him, of which Cathy was aware. Yet, Mark testified that he charged the majority of his business expenses to their credit card so he had documentation of the expenses.

Mark testified he was not minimizing his income in an effort to prevent an award of alimony to Cathy, but circumstances, such as a dock-workers strike and

excess inventories had resulted in a decline in income, and he provided a letter from one of his clients generally supporting his explanation.[1]  He testified he believed his 2016 gross income would be under $100,000.  His client stated in the letter that "2017 may be better but there are way too many variables to project with any certainty."  Mark also testified his business expenses had "gone up dramatically," in part because he was "trying to broaden [his] customer base" and had hired the young woman to assist in that endeavor.

Mark admitted some of the items he listed on his personal monthly budget were, at least in part, written off as business expenses.  He also admitted that in 2015 he purchased a 2014 Kia Sorento with his inheritance money, titled in his and the young woman's name, for the young woman to drive to use for business.  He did not list the vehicle on his financial affidavit because he purchased it with his inheritance money and "didn't think that was important."  He also did not claim the purchase as a business expense.

Mark testified he had two term-life-insurance policies with zero cash value—one with a benefit of $300,000 that expired in a year, and the other a benefit of $100,000 that expired in 2024.  Mark testified that he paid $104 per month on the latter policy and $300 per month for the $300,000 policy, though his financial affidavit stated he paid $350 per month for life insurance.  Mark testified that if he renewed the $300,000 policy when it expired, when he was age sixty-three, the

---

[1] Many of the issues stated in the letter occurred in 2015 and caused decreased sales in 2016.  That does not explain why Mark, at the end of 2015 and in early 2016, when he presumably knew of these issues, still projected his income would be $140,000.

premium would cost $23,000 per year. Mark testified he could not afford to pay for another policy.

Following the trial, the district court entered its decree dissolving the parties' marriage and finding Cathy established Mark dissipated marital assets without her authorization. The court found:

> The testimony is not believable that [Mark] returned all that he spent from the marital accounts by a deposit from his inheritance. He justifies all his conduct with the ability to use his inheritance to cure the infractions. Yet, he has no explanation for some of the things he has done . . . . The testimony also indicates money is in Wisconsin, but how much and where, the court cannot say. The Kia is just one example of this in light of the fact that he did not report it on his financial affidavit. Instead, the information was brought forth by [Cathy's] investigation into his bank accounts and other financial records. The money used was not spent for any benefit of the marriage. The money was not spent for necessities. The money was not spent for legitimate household or business expenses. Instead, the money was spent [on] a variety of personal living expenses for a third party. The spending on [Mark's] new employee seems reckless and extravagant given her history and the short time within which [Mark] has known this woman. But, as he indicated, he can throw his inheritance into the wind if he so choses.

The court ordered Mark to pay Cathy spousal support of $2000 per month until her death and to maintain a life insurance policy "in the amount of not less than the current aggregate of the policies insuring his life at the present," so long as Mark's alimony obligation existed. The court also ordered that the parties' "rental property located on Jackson Street . . . be subject to a mortgage in [Cathy's name] in the amount of $25,000 as her equitable share of the value of the property." Based upon the court's asset and debt distribution, the court ordered Mark to pay Cathy a lump-sum equalization payment of $26,786. Finally, the court ordered Mark to pay $7000 of Cathy's trial attorney fees.

Each party subsequently filed an Iowa Rule of Civil Procedure 1.904(2) motion and resisted the other's party's motion. Before the district court ruled on the motions, Mark filed a notice of appeal. Cathy filed a motion for limited remand with the supreme court. In response, the supreme court stated in its order:

> Ordinarily, the filing of an appeal by a party who has a pending motion to enlarge would result in the abandonment of that motion. *See IBP, Inc. v. Al-Gharib*, 604 N.W.2d 621, 628 (Iowa 2000); *Recker v. Gustafson*, 271 N.W.2d 738, 739 (Iowa 1978). However, the pendency of the appellee's motion rendered the appellant's appeal from the district court's September 28, 2016, order interlocutory. *See IBP, Inc.*, 604 N.W.2d at 628; *Wolf v. Ely*, 493 N.W.2d 846, 848 (Iowa 1992).
>
> Where a party has improperly sought review of a district court's ruling by filing a notice of appeal rather than an application for interlocutory review, the case shall not be dismissed but shall proceed as though the proper form of review had been sought. Iowa R. App. P. 6.108. This court treats the appellant's notice of appeal as an application for interlocutory appeal, and denies the application.
>
> The district court may rule on the parties' motions to enlarge. This court does not retain jurisdiction and if either party wishes to appeal after the district court rules on its pending motion, the party must file a notice of appeal (or cross-appeal) as provided in appellate rules 6.101 and 6.102.

Thereafter, the district court entered its ruling granting in part and denying in part each party's motion. Among other things, the court reduced the equalization payment to $21,596.50 to account for Mark's personal tax obligation that the court did not include in its initial accounting. The court ordered the parties to file amended state and federal income 2015 tax returns and awarded Cathy any funds received from those returns "as her share of the dissipation of marital assets that was found by the court," and it ordered that Mark pay the attorney-fee award to Cathy with funds other than the tax-refund monies. The court affirmed its order in all other respects.

Mark filed a second notice of appeal. He argues the court erred in awarding Cathy alimony for life because the court incorrectly calculated his income, failed to consider Cathy's income, ignored the parties' expenses, ages, health, and a prior agreement between the parties. He also contends the court erred in requiring him to maintain a life insurance policy for Cathy's benefit because his current policies are set to expire and the cost of replacing them at his age is prohibitive. He maintains the court erred in its distribution-of-marital-assets calculation, in finding he dissipated assets, and in awarding Cathy trial attorney fees. Cathy requests appellate attorney fees. We address Mark's arguments, out of turn.

### III. Discussion.

### A. Dissipation of Marital Assets.

We begin with Mark's challenge of the district court's determination that he dissipated marital assets. "A court may generally consider a spouse's dissipation or waste of marital assets prior to dissolution when making a property distribution." *In re Marriage of Kimbro*, 826 N.W.2d 696, 700 (Iowa 2013). A spouse dissipates assets when they lose or dispose of assets that should have been in the marital property division at the time of the dissolution. *See id.* at 700-01. However, marital assets may be spent on "legitimate household and business expenses." *Id.* at 701 (citation omitted).

We apply a two-pronged test to claims of dissipation of assets. *See id.* First, "a court must decide 'whether the alleged purpose of the expenditure is supported by the evidence.'" *Id.* (quoting *In re Marriage of Fennelly*, 737 N.W.2d 97, 104 (Iowa 2007) (citations omitted)). To establish this prong, a spouse "must show a nexus between the payment of the expenses and the use of the marital

assets at issue." *Id.* The second prong asks "whether that purpose amounts to dissipation under the circumstances." *Fennelly*, 737 N.W.2d at 104 (citation omitted). In addressing the second prong, courts look to the following factors:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.* at 104-05 (citation omitted).

Ultimately, the issue comes down to the court's credibility findings. The court expressly stated it did not believe Mark had actually "returned all that he spent from the marital accounts by a deposit from his inheritance," as Mark claimed. The court did not believe Mark's claims that the money he withdrew from the marital accounts were spent for legitimate business or household expenses. The court also believed Mark was hiding assets. Upon our de novo review, we find no reason in the record to disturb the court's credibility findings.

Here, in this long marriage, Mark essentially controlled the parties' money but for a few accounts Cathy held. Cathy was able to show there were substantial amounts of money withdrawn from their marital savings account from December 2012 to December 2015—and potentially more over the years. She believed, based upon the parties' bank and credit-card statements that at least $36,000 was missing from those years alone. Mark claimed that the withdrawn money was either used for home or business expenses or that he reimbursed their account for the withdrawals, but the only evidence he provided to support the claim was his own testimony. He did provide a list that he created of business expenses for 2014

and 2015, but he did not show how he paid for the claimed expenses. In fact, he testified he actually charged the majority of his business expenses to the credit card, which would not account for the cash withdrawals. Mark also provided bank records showing he moved money around, including depositing a $14,500 check from his inheritance account into the parties' marital account to reimburse the money he spent on the young woman in October and November 2015, but he did not provide receipts or documentation showing any reimbursements to the account before that time. Ultimately, given the amounts of cash Mark has withdrawn over the years, along with his failure to disclose assets and his defensiveness in explaining how he spent money, we agree with the district court's conclusion that he dissipated marital assets.

The court, in its rule 1.904(2) ruling expressly awarded Cathy any proceeds from the parties' 2015 tax returns, which Mark estimated would be approximately $7400,[2] as her share of the assets Mark had dissipated. Because this argument corresponds to Mark's argument concerning the district court's equitable-distribution calculation, we address it in that section below. We affirm in all other respects on the issue of dissipation.

### B. Spousal Support.

"Whether spousal support is justified is dependent on the facts of each case." *In re Marriage of Shanks*, 805 N.W.2d 175, 178 (Iowa Ct. App. 2011). Though not mandated, the district court may order spousal support be paid if it

---

[2] In her post-trial rule 1.904(2) motion, Cathy stated the amended 2015 returns had been filed but the expected refunds, which she estimated to be $7000, had not yet been received. Mark, in his rule 1.904(2) motion, anticipated the refunds to be $7596.

determines support payments are warranted after considering all of the following factors together:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1); *see also In re Marriage of Gust*, 858 N.W.2d 402, 407-08, (Iowa 2015); *Shanks*, 805 N.W.2d at 178.  The trial court is "in the best position to balance the parties' needs, and [appellate courts] should intervene . . . only where there is a failure to do equity."  *Gust*, 858 N.W.2d at 416.  The Iowa Supreme Court has "also recognized that the court can consider an intentional dissipation of assets to avoid future support payments when it makes an award of alimony."  *In re Marriage of Olson*, 705 N.W.2d 312, 317 (Iowa 2005).

Here, the parties were married for forty years.  The district court found Mark's income was approximately $145,000 per year.  Mark asserts the record does not support that finding, but by Mark's own account, he initially believed his income would be around that amount.  Moreover, Mark made almost $140,000 in

gross receipts in 2015 and was able to pay the young woman almost $8000 in wages. He was so sure of his business's income he employed the young woman at a salary of $50,000 per year. Given Mark's self-employed status and lack of credibility, we believe the evidence supports a finding that Mark's income was approximately $145,000 per year.

But even if we disagreed with the income figure, we would still find the district court's support award to be equitable. Cathy's income was $51,000 per year. Based upon Cathy's age, educational background, training, employment skills, and work experience, there is no reason to believe her earnings will ever increase such that she will become capable of earning enough to maintain a comparable standard of living to that she enjoyed during her marriage to Mark— even considering her present income along with additional education or working more hours. *See Mauer*, 874 N.W.2d at 111. We agree Cathy is entitled to lifetime spousal support. *See id.* The court ordered Mark to pay Cathy $2000 per month, which equals $24,000 per year. This amount plus Cathy's $51,000 annual income puts her at an income of approximately $75,000 per year. Mark's projected income on his answer to interrogatories was $139,000. That amount less $24,000 still puts his total income above $100,000 per year. And, if we use Mark's 2015 income of $100,000, his income still surpasses Cathy's by $1000. Considering all of the relevant factors stated above, along with the considerable latitude we accord the trial court in its spousal support award and credibility and other fact-findings, *see Gust*, 858 N.W.2d at 406-07, we conclude the spousal support award of $2000 per month was equitable and should not be disturbed. *See In re Marriage of Anliker*, 694 N.W.2d 535, 541 (Iowa 2005). But we expressly modify the first sentence of

the alimony provision in the decree to state: "Respondent shall pay the sum of $2,000.00 per month commencing October 1, 2016, and continuing until Petitioner's **or Respondent's** death." *See Gust*, 858 N.W.2d at 415 (noting "traditional spousal support is ordinarily unlimited in duration except" for certain circumstances, like the "death of either party").

### C. Life Insurance.

Mark argues the district court should not have required him to secure his spousal support obligations with life insurance, arguing that the cost of a $400,000 policy at his age is unduly burdensome. As noted above, the permanent spousal support award generally terminates upon the death of either party. *See id.* at 412; *In re Marriage of Lytle*, 475 N.W.2d 11, 12 (Iowa Ct. App. 1991); *In re Marriage of Hayne*, 334 N.W.2d 347, 352 (Iowa Ct. App. 1983). However, a requirement to maintain life insurance to secure spousal support is permissible. *See Olson*, 705 N.W.2d at 318; *In re Marriage of Weinberger*, 507 N.W.2d 733, 736 (Iowa Ct. App. 1993); *see also Stackhouse v. Russell*, 447 N.W.2d 124, 125 (Iowa 1989) ("A provision in a dissolution of marriage decree to maintain life insurance is enforceable."). If the party requesting the security has demonstrated a need and the cost of such a policy would not be unduly burdensome, the court may order the security of a life insurance policy. *See Olson*, 705 N.W.2d at 318; *see also In re Marriage of Debler*, 459 N.W.2d 267, 270 (Iowa 1990); *In re Marriage of Muow*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997).

Upon our de novo review, we find Cathy demonstrated a need for continued support. However, Cathy did not demonstrate the cost of such a policy in the amount ordered by the district court would not be unduly burdensome. Yet, we

are skeptical of Mark's claim that a $300,000 policy would cost him $23,000 per year, even given his age. Neither party provided an independent estimate of the cost of a new policy. Based upon Mark's testimony that he pays $104 a month for a $100,000 policy that does not expire until 2024, we believe a policy of this amount would be adequate to secure the support award without being unduly burdensome. Accordingly, we further modify the district court's alimony provision in the parties' decree—specifically, the second sentence—to state: "While this obligation continues to be paid, the Respondent shall maintain a $100,000 life insurance policy with Petitioner as the named beneficiary so as long as the Respondent has an obligation to pay alimony under the decree."

### D. Distribution of Assets and Trial Attorney's Fees.

"The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts," *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009), and Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See also In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). This first requires a determination of which property is subject to division, and then, considering the factors set forth in section 598.21(5), that property must be divided equitably. *See Fennelly*, 737 N.W.2d at 102.

Nevertheless, it "is important to remember marriage does not come with a ledger." *Id.* at 103-04. In determining how to equitably divide the property, an "equitable division is not necessarily an equal division." *Hansen*, 733 N.W.2d at 703. Though "it is generally recognized that equality is often most equitable," *Fennelly*, 737 N.W.2d at 102, "[e]quitable distribution depends upon the

circumstances of each case," *Hansen*, 733 N.W.2d at 703. Consequently, precedent is of little value. *See McDermott*, 827 N.W.2d at 682. "[K]eeping in mind there are no hard and fast rules governing economic issues in dissolution actions," we must apply the factors contained in section 598.21(5) in reaching an equitable division. *Id.* Notably, we will not disturb a court's valuation if it is within the range of permissible evidence. *See Hansen*, 733 N.W.2d at 703. Similarly, "we give the district court considerable discretion in determining whether it should award fees at the district court level." *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). An abuse of discretion occurs when the district court exercises its discretion "on grounds or for reasons that are clearly untenable or to an extent clearly unreasonable." *State v. Nelson*, 791 N.W.2d 414, 419 (Iowa 2010); *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000).

Mark argues on appeal that the additional $25,000 mortgage on the rental property was in error, given that the property was already accounted for in the assets part of the court's distribution table, a point Mark raised in his posttrial rule 1.904(2) motion. The district court stated in its ruling that the parties' pretrial stipulation had listed the Jackson Street "house as a separate asset of the MFT Property Investments with a value of $81,466," and the court noted the money for the house's purchase came from Mark's 401K that was accumulated throughout the parties' marriage. The court further explained it valued Mark's company, MFT Property Investments, "at the cash value in the bank according to the parties' representation. The marital aspect was [then] separated out and the value was divided according to the financial history of the purchase." Based on this reasoning, the court concluded "the value of the equity is properly divided."

Our own review of the evidence leads us to a different conclusion than the district court, even considering the weight afforded to the court's credibility findings and the permissible-range-of-evidence standard for valuations. *See In re Marriage of Hoak*, 364 N.W.2d 185, 192-93 (Iowa 1985). The only evidence presented was that the Jackson Street house's value was included in the $81,466.80 value of MFT Property Investments and related accounts described on the pretrial stipulation, the Provident Trust and Self-directed IRA. The court's reasons for the additional valuation of $50,000 was not within the range of permissible evidence. Therefore, we must strike the award of the additional $25,000 mortgage to Cathy.

Mark also argues the court erred in awarding Cathy a separate award of $7000 for trial attorney fees and in awarding Cathy the proceeds of the parties' 2015 tax refund. Mark argues Cathy's personal loan, which the court properly allocated between the parties as a liability, was a loan to pay for her trial attorney fees. He asserts the $7000 award to Cathy in addition to the loan's inclusion in the liability calculation "has caused [him] to pay the same debt to Cathy twice." He further argues the court's rule 1.904(2) ruling awarding Cathy all of the parties' tax refund essentially required him to pay a third time for Cathy's trial attorney fees. We do not find the court abused its discretion.

Concerning the tax refund, Mark listed it as an asset on his proposed resolution, but the district court did not address it in its decree. Mark then asked the court to address it in its rule 1.904(2) ruling, and he requested the refund be given to Cathy to cover the court's $7000 trial-attorney-fee award. Mark did not argue that the $7000 award was not proper because the court had included the loan in the liability calculation. Consequently, Mark failed to preserve the issue for

our review. *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) ("To preserve error on the issue, Timothy was obligated to seek a ruling on the issue.").

But even if Mark had preserved the issue, we would not find an abuse of discretion. The court in its rule 1.904(2) ruling expressly awarded the tax refund to Cathy as a separate award to compensate her for Mark's dissipation of assets, and that amount was well within the permissible range of evidence. Additionally, the attorney-fee affidavit submitted by Cathy's trial counsel showed a total bill at that time of $15,469.06. Clearly inclusion of the loan in the liabilities calculation and awarding a separate amount of $7000 in trial attorney fees was within the permissible range of evidence, considering the court's findings that Mark dissipated assets, failed to disclose assets to Cathy, was likely hiding more assets, and caused Cathy's trial attorney to spend time investigating the parties' finances. Here, the court's separate attorney-fee and 2015 tax-refund awards were within the permissible range of evidence, and we find no abuse of discretion.

### E. Appellate Attorney Fees.

Finally, Cathy requests appellate attorney fees. Whether to award appellate attorney fees is within our discretion. *See Spiker v. Spiker*, 708 N.W.2d 347, 360 (Iowa 2006). An award of appellate attorney fees depends on three factors: (1) the needs of the party making the request, (2) the ability of the other party to pay, and (3) whether the party making the request was obligated to defend the trial court's decision on appeal. *Id.* After considering the appropriate factors, along with Mark's success on at least one issue, we determine no appellate attorney fees should be awarded.

*IV. Conclusion.*

Based upon the foregoing, we modify the district court's decree as follows.

On page 10 of 10 of the district court's decree, in the paragraph titled "ALIMONY,"

the first two sentences are modified to state:

> Respondent shall pay the sum of $2,000.00 per month commencing October 1, 2016, and continuing until Petitioner's or Respondent's death.  While this obligation continues to be paid, the Respondent shall maintain a $100,000 life insurance policy with Petitioner as the named beneficiary as long as the Respondent has an obligation to pay alimony under the decree.

On the same page, we strike from the decree the paragraph titled "RENTAL

PROPERTY" in its entirety.  We affirm in all other respects.

**AFFIRMED AS MODIFIED.**